No. 22-13713-D

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

AUTOLIV JAPAN, LTD.,
*Defendant-Appellant,*

v.

JAMIE LEE ANDREWS, as surviving spouse of
Micah Lee Andrews, and JAMIE LEE ANDREWS,
as administrator of the Estate of Micah Lee Andrews,
*Plaintiffs-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Georgia

---

**PRINCIPAL BRIEF OF THE APPELLANT**

---

Doug Scribner
   Georgia Bar No. 632755
Keith R. Blackwell
   Georgia Bar No. 024493
Jenny A. Hergenrother
   Georgia Bar No. 447183
William J. Repko III
   Georgia Bar No. 301797

ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000

*Counsel for Defendant-Appellant Autoliv Japan, Ltd.*

*Autoliv Japan, Ltd. v. Andrews et al.*
*No. 22-13713-D*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 *et seq.,* Appellant Autoliv Japan, Ltd. certifies that the following judges, attorneys, other persons, associations of persons, firms, partnerships, and corporations have an interest in the outcome of this case:

1. Alston & Bird LLP, *counsel for appellant;*

2. Anand, Hon. Justin S., *United States Magistrate Judge;*

3. Andrews, Jamie Lee, *appellee;*

4. Autoliv, Inc. (NYSE: ALV), *affiliate of appellant;*

5. Autoliv Japan, Ltd., *appellant;*

6. Ballard, William L., *counsel for appellee;*

7. Ballard & Feagle, LLP, *counsel for appellee;*

8. Blackwell, Keith R., *counsel for appellant;*

9. Butler, James E. Jr., *counsel for appellee;*

10. Butler Prather LLP, *counsel for appellee;*

11. Cannella Snyder LLC, *counsel for appellee;*

12. Canella, Tedra L., *counsel for appellee;*

13. The Estate of Micah Lee Andrews, by and through Jamie Lee Andrews as administrator, *appellee;*

14. Feagle, Gregory R., *counsel for appellee;*

15. Hergenrother, Jenny A., *counsel for appellant;*

*Autoliv Japan, Ltd. v. Andrews et al.*
*No. 22-13713-D*

16. Jones, Hon. Steve C., *United States District Judge;*

17. Repko, William J. III, *counsel for appellant;*

18. Scribner, Doug, *counsel for appellant;*

19. The State of Georgia, *nonparty holder of interest in portion of the judgment below;* and

20. Weeks, Rory A., *counsel for appellee.*

Appellant Autoliv Japan, Ltd. further certifies that it is a wholly-owned subsidiary of Autoliv, Inc, a publicly traded company (NYSE: ALV).

## STATEMENT REGARDING ORAL ARGUMENT

Autoliv Japan, Ltd. desires oral argument and respectfully suggests that it would aid the decisional process in this appeal from an award of $100 million in punitive damages in a product liability and wrongful death case. This appeal presents an issue about whether the evidence presented at trial—including the testimony of multiple experts—is sufficient under Georgia law to authorize such a substantial award of punitive damages, and oral argument would assist the Court in its understanding and consideration of the evidence. Moreover, this appeal presents an issue about whether the punitive damages are grossly excessive under *BMW of North America v. Gore* and its progeny. Although the Court is well familiar with that line of cases, this appeal involves a question of first impression about how "full value of life" damages under Georgia law—which are, the Georgia Supreme Court has said, punitive in nature—should be counted, if at all, in the ratio of punitive to compensatory damages, a critical element of the due process analysis under *BMW*. Autoliv Japan suggests that the consideration of this question of first impression also would be aided by oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF CONTENTS .................................................... ii

TABLE OF CITATIONS .................................................. iv

STATEMENT OF JURISDICTION ......................................... ix

I.    STATEMENT OF THE ISSUES ...................................... 1

II.   STATEMENT OF THE CASE ........................................ 1

      A.    Statement of the Pertinent Facts ........................... 2
            1.    Mr. Andrews' Fatal Accident ........................ 2
            2.    Occupant Restraint Systems ......................... 3
            3.    The Airbag System in the 2005 Mazda 3 ...... 6
            4.    The Seatbelt in the 2005 Mazda 3 ............... 7

      B.    Statement of the Proceedings and Disposition Below .......... 10
            1.    The Lawsuit and Claims against Autoliv Japan ........ 10
            2.    Award of Summary Judgment to Autoliv Japan
                  and Appeal of Summary Judgment .............. 11
            3.    Bench Trial .................................. 12
            4.    Judgment against Autoliv Japan ................ 14
                  a.    Strict Liability for Defective Design .......... 14
                  b.    Apportionment of Fault ..................... 17
                  c.    Punitive Damages ......................... 17
            5.    Autoliv Japan's Motion to Amend the Judgment ........ 19

      C.    Statement of Scope of Review ............................. 22

III.  SUMMARY OF THE ARGUMENT ................................. 22

IV.   ARGUMENT AND CITATION OF AUTHORITY..........................25

    A.   The $100 million award of punitive damages in this
        case is excessive and not authorized by Georgia law. ..........25
        1.   The limits of punitive damages under Georgia
            law. ..................................................................................26
            a.   Punitive damages cannot be awarded upon
                a claim for wrongful death. ...................................27
            b.   Punitive damages can be awarded only to
                the extent that aggravating circumstances
                are proved clearly and convincingly....................28
            c.   An award of punitive damages must be in
                reasonable proportion to the wrong, the
                harm, and the culpability of the defendant........29
        2.   The evidence presented at trial does not clearly
            and convincingly establish a sufficient basis
            under Georgia law for any award of punitive
            damages, much less an award of $100 million. ...........31
        3.   The award of $100 million in punitive damages is
            unconstitutionally excessive under Georgia law
            and bears no rational relationship to the wrong........40

    B.   A $100 million award of punitive damages in this case
        is grossly excessive and amounts to a denial of due
        process...............................................................................41
        1.   Reprehensibility............................................................42
        2.   Ratio of Punitive Damages to Compensatory
            Damages........................................................................47
             a.   The Relevant Amount of Compensatory
                Damages...............................................................48
            b.   The Ratio...............................................................51
         3.   Other Civil Penalties Authorized by Law ...................55

    C.   In awarding punitive damages, the district court
        improperly relied on the financial circumstances of
        Autoliv Japan's parent corporation. .......................................57

    D.   Conclusion ..................................................................60

# TABLE OF CITATIONS

**Page(s)**

CASES

*Action Marine, Inc. v. Cont'l Carbon, Inc.*,
  481 F.3d 1302 (11th Cir. 2007) .............................................................. 50

*Andrews v. Autoliv Japan, Ltd.*,
  715 F. App'x 965 (11th Cir. 2018) ..................................................... 12, 35

*Audiotext Commc'ns Network v. US Telecom*,
  No. 94-2395-GT, 1996 WL 568839 (D. Kan. Sep. 4, 1996) ................ 51

*Banks v. ICI Ams., Inc.*,
  469 S.E.2d 171 (Ga. 1996) .................................................................... 29

*Bibbs v. Toyota Motor Corp.*,
  815 S.E.2d 850 (Ga. 2018) .................................................................... 27

*\*BMW of N. Am., Inc. v. Gore*,
  517 U.S. 559 (1996) ........................................................................ passim

*Boerner v. Brown & Williamson Tobacco Co.*,
  394 F.3d 594 (8th Cir. 2005) ................................................................ 54

*Budinich v. Becton Dickinson & Co.*,
  486 U.S. 196 (1988) ................................................................................ x

*Clark v. Chrysler Corp.*,
  436 F.3d 594 (6th Cir. 2006) ..................................................... 54, 55, 56

*Colonial Pipeline Co. v. Brown*,
  365 S.E.2d 827 (Ga. 1988) .......................................................... 29, 30, 41

*Democratic Party of Ga. v. Perdue*,
  707 S.E.2d 67 (Ga. 2011) ...................................................................... 30

*Dubey v. Pub. Storage, Inc.*,
  918 N.E.2d 265 (Ill. App. Ct. 2009) ..................................................... 51

*Engle v. Finch,
    139 S.E. 868 (Ga. 1927) ................................................................ 28, 40, 49

Ford Motor Co. v. Sasser,
    618 S.E.2d 47 (Ga. App. 2005) .................................................... 37

Ford Motor Co. v. Stubblefield,
    319 S.E.2d 470 (Ga. App. 1984) .................................................. 27

Gen. Motors Corp. v. Moseley,
    447 S.E.2d 302 (Ga. App. 1994) .................................................. 33

Gilman Paper Co. v. James,
    219 S.E.2d 447 (Ga. 1975) ........................................................... 29

Golden Pantry Food Stores v. Lay Bros., Inc.,
    597 S.E.2d 659 (Ga. App. 2004) .................................................. 27

Hardeman v. Monsanto Co.,
    997 F.3d 941 (9th Cir. 2021) ....................................................... 43

Harden v. United States,
    688 F.2d 1025 (5th Cir. 1982) ..................................................... 28

Hernandez v. Crown Equip. Co.,
    92 F. Supp. 3d 1325 (M.D. Ga. 2015) ........................................ 36

Holman v. Burgess,
    404 S.E.2d 144 (Ga. App. 1991) .................................................. 57

Hosp. Auth. of Gwinnett Cnty. v. Jones,
    409 S.E.2d 501 (Ga. 1991) ........................................................... 31

Ishimatsu v. Royal Crown Ins. Corp.,
    2010 MP 8, N. Mar. I. 424 (2010) .............................................. 51

Johansen v. Combustion Eng'g, Inc.,
    170 F.3d 1320 (11th Cir. 1999) ................................................... 52

Kemp v. AT&T,
    393 F.3d 1354 (11th Cir. 2004) ................................................... 52

*Lompe v. Sunridge Partners, LLC*,
  818 F.3d 1041 (10th Cir. 2016) .................................................... passim

*Mack Trucks, Inc. v. Conkle*,
  436 S.E.2d 635 (Ga. 1993) ........................................................ 33

*Mascarenas v. Cooper Tire & Rubber Co.*,
  643 F.Supp.2d 1363 (S.D. Ga. 2009) ........................................... 33

*Myers v. Cent. Fla. Invs., Inc.*,
  592 F.3d 1201 (11th Cir. 2010) .................................................. 22

*Nissan Motor Co. v. Maddox*,
  486 S.W.3d 838 (Ky. 2015) ....................................................... 33

*Planned Parenthood of the Columbia/Williamette, Inc. v. Am. Coalition of Life Activists*,
  422 F.3d 949 (9th Cir. 2022) ..................................................... 49

*Powell v. State*,
  510 S.E.2d 18 (Ga. 1998) .......................................................... 30

*S. Ry. Co. v. O'Bryan*,
  45 S.E. 1000 (Ga. 1903) ............................................................ 29

*Savannah Elec. Co. v. Bell*,
  53 S.E. 109 (Ga. 1906) ......................................................27, 28, 49

*Shelby Ins. Co. v. Ford*,
  454 S.E.2d 464 (Ga. 1995) ........................................................ 58

*Smith v. Milikin*,
  276 S.E.2d 35 (Ga. 1981) .......................................................... 31

*\*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ................................................................ passim

*\*Stone Man v. Green*,
  435 S.E.2d 205 (Ga. 1993) .....................................................32, 33

*Sw. R.R. Co. v. Paulk*,
  24 Ga. 356 (1858) .................................................................... 49

vi

*U.S. EEOC v. W&O Inc.*,
213 F.3d 600 (11th Cir. 2000)................................................................. 52

*Uniroyal Goodrich Tire Co. v. Ford*,
461 S.E.2d 877 (Ga. App. 1995)............................................................. 34

\*United States v. Fid. Cap. Corp.*,
920 F.2d 827 (11th Cir. 1991)....................................................22, 58, 59

*Vasconcelo v. Miami Auto Max, Inc.*,
981 F.3d 934 (11th Cir. 2020)..................................................................x

*Vazquez v. Raymond Corp.*,
2019 WL 176106 (N.D. Ga. Jan. 11, 2019).......................................... 36

*Watson v. Johnson Mobile Homes*,
284 F.3d 568 (5th Cir. 2002)................................................................. 47

*Welch v. Gen. Motors Corp.*,
949 F. Supp. 843 (N.D. Ga. 1996)...................................................32, 37

*Western & Atl. R. Co. v. Michael*,
165 S.E. 37 (Ga. 1932)........................................................................... 28

*Williams v. First Advantage LNS Screening Solutions Inc.*,
947 F.3d 735 (11th Cir. 2020)........................................................passim

*Zhang v. Am. Gem Seafoods, Inc.*,
339 F.3d 1020 (9th Cir. 2003)............................................................... 50

*Zimmerman v. Direct Fed. Credit Union*,
262 F.3d 70 (1st Cir. 2001).................................................................... 50

## RULES

Federal Rule of Appellate Procedure 4.......................................................x

Federal Rule of Civil Procedure 59 ............................................................x

## STATUTES

28 U.S.C. § 1291.........................................................................................x

28 U.S.C. § 1332................................................................. ix

28 U.S.C. § 1441................................................................. ix

49 U.S.C. § 30165..........................................................55, 56

O.C.G.A. § 9-11-68 ...............................................................x

O.C.G.A. § 51-12-5.1 ............................................27, 28, 31, 57

Transp. Recall Enhancement, Accountability, and Documentation
    Act, Pub. L. No. 106-414, 114 Stat. 1800, § 5 ...................... 56

OTHER AUTHORITIES

Ga. Const. art. I, § I, para. I ..................................................... 56

Ga. Const. art. I, § I, para. XVII ............................................... 29

## STATEMENT OF JURISDICTION

In September 2014, this lawsuit was commenced in the State Court of Fulton County, Georgia, and it then was removed to the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1441 *et seq*. (Doc. 1.) Because the parties were citizens of different states, and because the amount in controversy exceeded $75,000, the district court properly exercised jurisdiction under 28 U.S.C. § 1332 (a). (Doc. 1.) Following the dismissal of all named defendants other than Autoliv Japan, Ltd.,* and a bench trial in October 2021, the district court

---

\* Thirteen defendants were named in the original complaint: Mazda Motor Corporation, Mazda Motor of America, Inc., Autoliv, Inc., Autoliv ASP, Inc., Autoliv AB, Autoliv Japan, Ltd., Autoliv Safety Technology, Inc., Autoliv LLC, Autoliv North America, Inc., Robert Bosch LLC, Robert Bosch North America Corporation, Robert Bosch Motor Systems Corporation, and Bosch Corporation. (Doc. 1.) The complaint was amended in November 2014 to drop the claims against three of these defendants—Autoliv LLC, Autoliv North America, Inc., and Robert Bosch Motor Systems Corporation—and to add Robert Bosch GmbH as an additional defendant. (Doc. 17.) In April 2015, the district court dismissed Bosch Corporation for lack of personal jurisdiction. (Doc. 106.) In August 2015, the district court granted consent motions to dismiss the claims against Robert Bosch LLC, Robert Bosch North America Corporation, and Robert Bosch GmbH with prejudice (Doc. 132), and to dismiss Autoliv, Inc., Autoliv ASP, Inc., Autoliv AB, Autoliv Safety Technology, Inc. without prejudice. (Doc. 137.) And in July 2016, the district court granted a consent motion to dismiss, with prejudice, Mazda Motor Corporation and Mazda Motor of America, Inc., which settled with

entered final judgment against Autoliv Japan on December 31, 2021. (Doc. 534.) Pursuant to Federal Rule of Civil Procedure 59, the plaintiffs filed a motion to amend the judgment on January 10, 2022 (Doc. 536), and Autoliv Japan filed a motion to amend the judgment or, in the alternative, for a new trial on January 28, 2022. (Doc. 543.) The district court resolved these motions on September 30, 2022 (Doc. 586), and the same day, the district court entered an amended final judgment. (Doc. 587.) Autoliv Japan then filed its notice of appeal on October 28, 2022. (Doc. 592.) Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction of this appeal from the final judgment of the district court.** *See also* Fed. R. App. P. 4(a)(4)(A)(iv).

---

Ms. Andrews. (Doc. 272.) This left Autoliv Japan, Ltd. as the only remaining named defendant.

** The plaintiffs also filed a post-judgment motion under O.C.G.A. § 9-11-68(e), which authorizes a prevailing party to recover certain attorney's fees and expenses of litigation incurred as a result of frivolous claims, defenses, or positions asserted by another party. (Doc. 536.) This motion remained pending at the time Autoliv Japan commenced this appeal, but "an unresolved issue of attorney's fees for the litigation in question does not prevent judgment on the merits from being final" for purposes of appellate jurisdiction. *Vasconcelo v. Miami Auto Max, Inc.,* 981 F.3d 934, 940 (11th Cir. 2020) (citing *Budinich v. Becton Dickinson & Co.,* 486 U.S. 196 (1988)). On December 29, 2022, the district court denied this motion, concluding that no frivolous claims, defenses, or positions were asserted.

# I.    STATEMENT OF THE ISSUES

1. Whether the evidence presented at trial was sufficient to clearly and convincingly establish egregious wrongdoing and extreme culpability sufficient under Georgia law to sustain an award of $100 million in punitive damages.

2. Whether an award of $100 million in punitive damages in this case—in which the measure of pertinent compensatory damages is far, far less—is consistent with the constitutional guarantee of due process.

3. Whether the district court erred by piercing the corporate veil and awarding $100 million in punitive damages against Autoliv Japan based on the financial circumstances of its parent, Autoliv, Inc.

# II.    STATEMENT OF THE CASE

This is a product liability and wrongful death case, arising from a single-vehicle accident in which Micah Lee Andrews crashed his 2005 Mazda 3 and sustained fatal injuries. His estate and surviving spouse sued the manufacturers of his vehicle (Mazda), airbag sensor system (Bosch), and seatbelt assembly (Autoliv Japan). After the claims against Mazda and Bosch were resolved, the district court tried the claims against Autoliv Japan without a jury. The district court then entered

judgment against Autoliv Japan, awarding more than $118 million, including $100 million in punitive damages to the estate.

## A.    Statement of the Pertinent Facts

### 1.    Mr. Andrews' Fatal Accident

On the evening of April 12, 2013, Mr. Andrews was driving his 2005 Mazda 3 automobile on Interstate 575 in Cobb County, Georgia, when he suddenly drove off the highway and down an embankment, where he crashed into three trees.[1] (Doc. 534 at 6-7.) When his car impacted the trees, it was traveling approximately 35 mph, and although his airbag should have deployed, it did not. (*Id.* at 7.) Without the deployment of an airbag, his seatbelt spooled out 20 inches of webbing, and his head hit the steering wheel with significant force. (*Id.*) About four minutes later, he died at the scene as a result of his head injuries. (*Id.* at 7-8, 13-15.) It is undisputed that, if his airbag had deployed, he would have survived the crash. (Doc. 600 at 103:21-23; Doc. 603 at 21:22-25.)

---

[1] Although the reason Mr. Andrews drove off the highway was disputed at trial, the district court found that he engaged in a sudden avoidance maneuver, likely to avoid a large turtle in the road. (Doc. 534 at 9-10.)

### 2.    *Occupant Restraint Systems*

Automobile occupant restraint systems are complex and consist of many component systems and parts—including seatbelt assemblies and airbag systems—that are distinct but meant to function together to avoid or mitigate injuries in the event of a crash. (Doc. 534 at 9 n.12.) Many of these component systems and parts are themselves complex, having their own component systems and parts. A seatbelt assembly, for instance, has numerous components, including a buckle, latch plate, webbing, and retractor. (Doc. 551 at 10:8-12:5.) Typically, in automotive design, manufacturers of restraint system components offer multiple options to automobile manufacturers, and automobile manufacturers select the particular components and configurations for their vehicles. (*Id*. at 12:21-14:23.) With respect to the 2005 Mazda 3, Mazda made the final decisions about the components of its occupant restraint system. (*Id*. at 23:17-20; Doc. 550 at 120:2-17, 129:25-130:1; Doc. 552 at 46:21-24.)

Although seatbelts often are known as "primary" safety devices in automobiles, all new vehicles sold in the United States today have airbags too, and the seatbelts and airbags are designed to work together. (Doc. 534 at 16; Doc. 599 at 44:6-8; Doc. 601 at 110:16-18.) More

specifically, all modern vehicles feature airbags and *load-limiting* seatbelts, which the National Highway Transportation Safety Administration (NHTSA) encourages. (Doc. 600 at 84:21-25; Doc. 601 at 113:1-3.) Load-limiting seatbelts are specifically designed to work with airbags, and they are not installed in vehicles without airbags. (Doc. 601 at 111:5-7.) The 2005 Mazda 3 had airbags and a load-limiting seatbelt for the driver. (Doc. 534 at 16, 24.)

In load-limiting seatbelts, the retractor[2] has a torsion bar[3] or other mechanism that—to avoid serious thoracic injuries, which sometimes may be fatal—limits the force exerted by the seatbelt on an occupant's chest during a crash event. (Doc. 534 at 24; Doc. 600 at 68:6-15; Doc. 601 at 114:5-115:10.) This limitation of force is accomplished by permitting the webbing to spool out in a crash event, which allows the occupant to move forward. (Doc. 534 at 24; Doc. 601 at 114:5-115:10.) The airbag, in turn, absorbs the forward momentum of the occupant and limits the extent of his forward movement. (Doc. 600 at 78:10-13.) Although it is

---

[2] The retractor is the part of the seatbelt assembly that facilitates and regulates the spooling out of the webbing. (*See* Doc. 534 at 24.)

[3] A torsion bar is a metal bar in the retractor, around which the webbing wraps. (*See id.*)

known in the automotive industry that airbags sometimes fail to deploy when they should (Doc. 550 at 34:6-14), there is *no* quantitative evidence in this case of the frequency with which they fail, much less the frequency with which they fail in serious crashes like the one at issue here.

The extent to which the webbing spools out during a crash event—known as the "payout"—involves an engineering tradeoff between head and thoracic injuries. (Doc. 600 at 45:5-22, 69:12-70:15; Doc. 601 at 113:21-115:10.) On the one hand, increasing the payout—by reducing the deployment threshold of the retractor[4]—reduces the risk of thoracic injuries but simultaneously increases the risk of head injuries. (Doc. 601 at 113:11-115:4, 124:3-22.) On the other hand, reducing the payout—by increasing the deployment threshold or, less commonly, adding a "stop"[5]—reduces the risk of head injuries but increases the risk of thoracic injuries. (*Id.*; Doc. 551 at 28:23-29:1.) The risk of serious, seatbelt-induced thoracic injury is especially acute for individuals who—

---

[4] The deployment threshold refers to the force that must be applied by the seatbelt to an occupant—2.0 kilonewtons (kN), for instance—before the retractor will begin to spool out webbing. (*See* Doc. 617-16 (Def. Trial Ex. 1234) at 52:13-16; Doc. 601 at 37:19-38:17.)

[5] A "stop" is a mechanism that prevents payout beyond a designated length of webbing. (Doc. 534 at 29.)

5

unlike Mr. Andrews[6]—are small, female, or elderly. (Doc. 552 at 26:17-21; Doc. 603 at 24:22-25:1.) Striking a balance between the risk and mitigation of head and thoracic injuries respectively requires a consideration of many factors, including the overall structure of a vehicle, the heights and weights of its potential occupants, and speeds of potential crash events. (*See* Doc. 600 at 40:16-19, 111:10-24; Doc. 601 at 113:21-115:13; Doc. 603 at 24:22-25:1.) Not all vehicles are the same, not all occupants are the same, and not all crashes occur at the life-threatening speed of 35 mph.

### 3.    *The Airbag System in the 2005 Mazda 3*

Mr. Andrews' airbag failed to deploy because the airbag sensor system—which is intended to detect crash events that warrant airbag deployment and to instruct the airbag to deploy—was defectively designed and did not deliver a deployment signal to the airbag. (Doc. 534 at 19-21; Doc. 550 at 44:18-24.) Mazda chose the problematic configuration of the airbag sensor system—a system that depended on

---

[6] At the time of the accident, Mr. Andrews was 38 years old, 6 feet, 2 inches tall, and 226 pounds. (Doc. 534 at 8; Doc. 548 at 91:8-24.)

6

one front sensor, not two—and Bosch supplied it.[7] (Doc. 550 at 44:18-24, 119:14-120:1.) During the design of the 2005 Mazda 3, Bosch gave Mazda the option of a single- or dual-sensor system, despite knowing that the dual-sensor system would be more appropriate for the vehicle. (*Id.* at 119:14-120:1; Doc. 617-8 (Def. Trial Ex. 101) at 4.) If Mazda had chosen a dual-sensor system, it likely would have signaled Mr. Andrews' airbag to deploy, and the airbag, in fact, would have deployed. (Doc. 550 at 107:10-110:22.)

### 4.    *The Seatbelt in the 2005 Mazda 3*

The load-limiting driver seatbelt in the 2005 Mazda 3 had a deployment threshold of 2.0 ± 0.5 kN[8] and no stop. (Doc. 534 at 25.) During vehicle design, Autoliv Japan gave Mazda the option of a high, medium, or low deployment threshold. Mazda chose the low option. (*Id.* at 80.) At the time it chose the 2.0 ± 0.5 kN deployment threshold, Mazda was aware that, all else being equal, a load-limiting seatbelt with a higher deployment threshold would result in less payout than a retractor

---

[7] Autoliv Japan supplied the airbag itself (Doc. 534 at 7), but no one in this case claims that the airbag was defective.

[8] A deployment threshold of 2.0 ± 0.5 kN means that the threshold is between 1.5 to 2.5 kN. (Doc. 534 at 25.)

with a lower deployment threshold. (Doc. 601 at 37:19-38:17, 122:19-125:5.) Indeed, at one point in the vehicle design process, Mazda informed Autoliv Japan that it was considering "chang[ing] to [a] higher load level"—meaning a higher deployment threshold—but ultimately decided not to do so. (Doc. 620-42 (Pl. Trial Ex. 126); Doc. 617-7 (Def. Trial Ex. 100).) Mazda similarly was aware—and had known since the 1980s—that a stop feature could be incorporated into a seatbelt to limit payout. (Doc. 600 at 110:23-112:7; Doc. 601 at 123:16-24.)

It is undisputed that a higher deployment threshold generally limits payout to a greater extent than a low deployment threshold. But in this case, there is *no* evidence that Mr. Andrews would have survived the crash if Mazda had chosen—and Autoliv Japan had supplied—a seatbelt with any feasible higher deployment threshold. (*See* Doc. 600 at 112:20-113:2.) In particular, there is no evidence that Mr. Andrews would not have struck his head against the steering wheel if only his seatbelt had a deployment threshold greater than 2.0 kN, the failure of his airbag to deploy notwithstanding. Indeed, based on the evidence offered at trial, only a six-inch stop would have avoided the fatal head injuries that Mr. Andrews sustained. (*See* Doc. 534 at 53 n.50.) That said, given the speed

at which Mr. Andrews collided with the trees, a six-inch stop would have also put him at risk of serious and potentially fatal thoracic injuries. (Doc. 603 at 29:3-9; *id.* at 27:11-28:7.)

By the time Mazda chose a 2.0 ± 0.5 kN deployment threshold for the 2005 Mazda 3, Honda and Mitsubishi previously had selected the same deployment threshold for the Honda CRV and Mitsubishi Outlander. (Doc. 620-140 (Pl. Trial Ex. 1163) at 96:20-97:4.) And although a stop would have been feasible in a technical sense, stops are not commonly used in the automotive industry.[9] (Doc. 551 at 28:23-29:1.) Moreover, prior to production of the 2005 Mazda 3, the driver seatbelt passed all seatbelt-specific testing required by the federal government. (Doc. 534 at 80.) And the vehicle itself received four of five stars in the government's New Car Assessment Program (NCAP), which involved crash testing, including a frontal collision at 35 mph. (Doc. 534 at 26, 80.) The 2005 Volvo S40—a vehicle with a higher driver seatbelt deployment threshold of 6.0 kN—achieved the same NCAP rating. (Doc. 620-6 (Pl. Trial Ex. 9); Doc. 534 at 19 n.17.)

---

[9] Indeed, at trial, Autoliv Japan's biomechanics expert explained that a six-inch stop would have caused Mr. Andrews' chest to endure a force of 2,700 pounds during his crash event. (Doc. 603 at 26:12-29:10.)

**B.    Statement of the Proceedings and Disposition Below**

### 1.    *The Lawsuit and Claims against Autoliv Japan*

In September 2014, Jamie Lee Andrews brought this lawsuit in two distinct capacities. (Doc. 1-2.) *First,* as the administrator of the Estate of Micah Lee Andrews, she asserted tort claims on behalf of the estate, seeking compensatory damages for pain and suffering, medical expenses, and funeral expenses, as well as punitive damages. (*Id*. at 37 ¶¶ 105-07.) *Second,* as the surviving spouse of Mr. Andrews, she asserted for herself a claim of wrongful death, seeking damages for the full value of her late husband's life. (*Id*. at 37 ¶ 104.) In the original complaint, Ms. Andrews named Autoliv, Inc. and six of its affiliates (including Autoliv Japan), Bosch Corporation and three of its affiliates, and Mazda Motor Corporation and one of its affiliates as defendants. (*Id*. at 13.) Eventually, all of the defendants except Autoliv Japan were dismissed.

As against Autoliv Japan, Ms. Andrews alleged that it supplied a defective and unreasonably dangerous seatbelt assembly for use in the 2005 Mazda 3. (Doc. 1-2 at 22 ¶ 39, 23 ¶ 42.) More specifically, she claimed that the seatbelt assembly was defective because it allowed too much payout in the event of a frontal collision. (*Id*. at 15-16 ¶ 61.) By the

time of trial, Ms. Andrews had clarified her theory of defect, contending that the seatbelt assembly was defective because it should have featured—but did not include—either a higher deployment threshold or a stop to limit payout to six inches. (*See* Doc. 534 at 28-29, 42, 53-54 n.50.) Based on these allegations, Ms. Andrews asserted claims for strict product liability, negligence, and wrongful death predicated on strict liability and negligence. (Doc. 1-2 at 27-30.)

## 2. *Award of Summary Judgment to Autoliv Japan and Appeal of Summary Judgment*

In March 2016, Autoliv Japan moved for summary judgment, asserting that it could not be liable under Georgia law for the design of the allegedly defective seatbelt assembly because the seatbelt assembly was designed by Mazda, and Autoliv Japan was not actively involved in that design process. (Doc. 224-1.) The district court agreed and granted the motion for summary judgment in January 2017.[10] (Doc. 274.) Ms. Andrews appealed.

---

[10] The district court also concluded that Ms. Andrews had not pleaded any claim for failure to warn, and even if she had, Autoliv Japan would be entitled to summary judgment because she failed to come forward with any evidence that a failure to warn caused her husband's death. (Doc. 274 at 17 n.6.)

In *Andrews v. Autoliv Japan, Ltd.,* 715 F. App'x 965, (11th Cir. 2018), this Court reversed. The Court explained that, because Autoliv Japan manufactured the components of the seatbelt assembly, if any of those components were defective, Autoliv Japan could be liable under Georgia law, whether or not it was actively involved in the design of the seatbelt assembly as a whole. 715 F. App'x at 966. And in any event, the Court found a genuine issue of disputed fact about whether Autoliv Japan had active involvement in the design process of the seatbelt assembly. *Id.*[11]

### 3.    *Bench Trial*

In October 2021, the district court tried the case against Autoliv Japan, over the course of six days and without a jury, by consent of the parties. In support of the claims for strict liability, wrongful death, and punitive damages,[12] Ms. Andrews introduced testimony from twelve witnesses, including experts in accident reconstruction (Doc. 549),

---

[11] Although this Court reversed the award of summary judgment on the claims for strict product liability, negligent design, and wrongful death, it affirmed the judgment of the district court to the extent that it dismissed any claim for failure to warn. *See* 715 F. App'x at 967.

[12] Before trial, Ms. Andrews withdrew the estate's negligence claim. (Doc. 534 at 3 n.4.)

biomechanics (Doc. 600), airbag design (Doc. 550), seatbelt design (Doc. 601), and the role of component suppliers in the automotive industry (Doc. 550). Ms. Andrews also offered more than 150 exhibits, including annual reports, Form 10-K filings, and other documents evidencing the financial condition of Autoliv Japan's corporate parent, Autoliv, Inc. [13]

For its part, Autoliv Japan offered more than a dozen additional exhibits and the testimony of four witnesses, including its own experts in biomechanics (Doc. 603), seatbelt design (Doc. 552), and the role of component suppliers (*id.*). Using this evidence, as well as evidence offered by Ms. Andrews, Autoliv Japan sought to establish that the seatbelt at issue was not defective. (Doc. 534 at 72.) Autoliv Japan also presented evidence and argument that fault should be apportioned to Mr. Andrews (for driving off the highway), Bosch (for supplying a defective airbag sensor system), and Mazda (for making the final design decisions about

---

[13] The district court admitted the evidence of Autoliv, Inc.'s financial circumstances over Autoliv Japan's objection. Before trial, Autoliv Japan moved to exclude such evidence, arguing that only the financial circumstances of the named defendant—Autoliv Japan—were relevant to punitive damages. (Doc. 455 at 1.) The district court denied the motion, relying on an unpublished decision in which the Fourth Circuit admitted a parent company's financial reports to the extent that they reflected the financial circumstances of the subsidiary. (Doc. 494 at 6-7.)

the airbag and seatbelt). (Doc. 534 at 8, 60, 71, 72.) Autoliv Japan argued that punitive damages were not warranted, twice moving the district court—at the close of Ms. Andrews' case, and again at the close of its own case—for a directed verdict. (Doc. 602 at 36:4-46:6; Doc. 603 at 62:8-63:8.)

### 4.    *Judgment against Autoliv Japan*

#### a.    *Strict Liability for Defective Design*

In December 2021, the district court announced its verdict and entered judgment against Autoliv Japan, finding it strictly liable for defective design of the driver seatbelt assembly in the 2005 Mazda 3. (Doc. 534 at 37.) Applying the risk-utility standard for strict product liability under Georgia law, the district court concluded that the utility of the design was outweighed by the risk that it presented. (*Id.* at 46.) Notably, although Ms. Andrews' own experts acknowledged at trial that the design of a seatbelt with respect to payout involves an engineering tradeoff between potential head and thoracic injuries,[14] the district court found that the *only* utility of the seatbelt as designed was "that the car might get slightly better scores for potential chest injuries in the NCAP

---

[14] *See* Doc. 600 at 45:5-22, 69:12-70:10 (biomechanics expert); Doc. 550 at 130:7-24 (airbag expert); Doc. 601 at 113:21-115:10 (seatbelt expert).

test." (*Id.* at 46.) Emphasizing the availability of seatbelts with higher deployment thresholds, the district court found a higher deployment threshold to be a safer, feasible alternative design. (*Id.* at 47.) The district court also found that a stop was a feasible alternative design.[15] (*Id.* at 48-49.)

In addition, the district court characterized the seatbelt at issue as an "extreme outlier" in terms of deployment threshold, noting testimony by Ms. Andrews' seatbelt expert that a $2.0 \pm 0.5$ kN deployment threshold was the lowest he had ever seen.[16] (Doc. 534 at 49.) The district court also

---

[15] The district court acknowledged the absence of evidence that Mr. Andrews would have avoided fatal head injuries if only his seatbelt featured a higher deployment threshold, but the district court said that proof of feasible alternative designs need not include such evidence, which instead relates to the distinct question of proximate cause. (Doc. 534 at 53-54 n.50; *see also* Doc. 420 (declining to follow Georgia pattern jury instruction that "you may consider evidence of alternative designs that would have made the product safer and could have prevented or minimized the plaintiff's injury").) And in any event, the district court found that Mr. Andrews would have avoided fatal *head* injuries if the seatbelt had a stop, without acknowledging the evidence that a stop would have presented a danger—for Mr. Andrews, and certainly for other potential occupants of the 2005 Mazda 3—of serious *thoracic* injuries. (Doc. 534 at 53-54 n.50.)

[16] Even if the deployment threshold were the lowest this expert had ever seen, the district court failed to acknowledge that other vehicle manufacturers—Honda and Mitsubishi—had used seatbelts with the

suggested that the seatbelt was an "extreme outlier" in terms of how much webbing it spooled out during NCAP crash testing relative to the seatbelts in 18 other vehicles in the same class. (*Id.* at 27, 35, 47-50, 79.) The district court failed to acknowledge, however, the absence of any evidence that the outcome for Mr. Andrews would have been different had the 2005 Mazda 3 used any of these other seatbelts. Indeed, the evidence showed that the driver seatbelts in all 19 vehicles in the class would have paid out more than 6 inches (in the event their airbags and pretensioners failed to deploy, as was the case in Mr. Andrews' crash[17]), and there was no evidence that Mr. Andrews would have survived the accident with more than 6 inches of seatbelt payout. (*See* Doc. 620-123 (Pl. Trial Ex. 1074) at 2; Doc. 600 at 47:1-9, 61:15-22, 71:11-80:12, 112:20-113:10; Doc. 552 at 55:8-56:10.)

---

same deployment threshold. (*See* Doc. 620-140 (Pl. Trial Ex. 1163) at 96:20-97:4.)

[17] A "pretensioner" is a component of the occupant restraint system that removes upwards of three inches of webbing slack when it fires. The pretensioner fires during NCAP testing, but it did not fire in the underlying accident because it did not receive a signal to deploy. (*See* Doc. 600 at 61:15-22, 75:18-19.)

### b. Apportionment of Fault

The district court turned next to apportionment of fault. The district court declined to attribute any contributory fault to Mr. Andrews. (Doc. 534 at 69-70.) And although it was undisputed that Bosch supplied a defective airbag sensor system that resulted in the failure of the airbag to deploy (*id.* at 20, 71), the district court also declined to apportion fault to Bosch, noting that the defective sensor system was the result of "a Mazda decision." (*Id.* at 71.) The district court apportioned 50 percent of the fault to Mazda, leaving Autoliv Japan with the other 50 percent. (*Id.* at 81.)

### c. Punitive Damages

The district court concluded that punitive damages were warranted because "there is evidence that shows willful misconduct and that entire want of care that would raise the presumption of conscious indifference." (Doc. 534 at 82.) As a basis for this conclusion, the district court pointed to:

- Autoliv Japan's failure to warn consumers or NHTSA about the "dangers of the product," (*id.* at 83, 85-86);

- Autoliv Japan's awareness that airbags sometimes—in unspecified circumstances and with uncertain frequency—fail to deploy and

that, if an airbag failed to deploy, the seatbelt in the 2005 Mazda 3 would spool out substantial webbing (*id.* at 83-84);

- A January 2002 email in which Mazda informed Autoliv Japan that the heads of crash-test dummies were "bottoming out" on the steering wheel in simulated testing[18] (*id.* at 83), and the testimony of an Autoliv Japan witness at trial—which the court found to be inconsistent with the email—that "Mazda was not concerned, so we weren't concerned"[19] (*id.* at 84); and

- Evidence that Autoliv Japan suggested that Mazda use a nondigressive load limiter, which "weakened" the seatbelt[20] (*id.* at 84).

The district court notably cited no evidence that Autoliv Japan was financially motivated to encourage Mazda to select a particular seatbelt design, and it cited no evidence that Autoliv Japan was aware of any

---

[18] The district court did not acknowledge the evidence at trial that the "bottoming out" occurred in crash testing at the unusually severe speed of approximately 56 mph, which likely skewed the testing results. (Doc. 620-43 (Pl. Trial Ex. 128) at 2; Doc. 599 at 31:7-14, 31:20-22; Doc. 601 at 115:18-20; Doc. 551 at 18:1-21:11; Doc. 552 at 67:23-69:5.)

[19] The testimony shows that, when the witness said "Mazda was not concerned, so we weren't concerned," he was referring to a point in time after NCAP testing, which came well after the January 2002 email. (Doc. 599 at 31:7-38:1; Doc. 617-12 (Def. Trial Ex. 1151) at 1.) Indeed, during his testimony, the witness acknowledged that Mazda was expressing concerns in the January 2002 email. (Doc. 599 at 32:15-33:2.)

[20] The district court failed to acknowledge the absence of any evidence that Mr. Andrews' injuries would have been less severe had his seatbelt incorporated a digressive load limiter.

instances—before Mr. Andrews' crash—in which a seatbelt with a 2.0 ± 0.5 kN deployment threshold was alleged to be defective.

The district court awarded $100 million in punitive damages. (Doc. 534 at 96.)  In awarding that amount against Autoliv Japan, the district court explicitly based the award on the financial circumstances of its corporate parent, Autoliv, Inc. (*Id.* at 87-94.) The district court found that it was appropriate to do so because "Autoliv has ignored formal divisions among Autoliv corporate entities when it comes to the seatbelt at issue." (*Id.* at 91.)

### 5.    *Autoliv Japan's Motion to Amend the Judgment*

Autoliv Japan timely filed a motion to amend the judgment or, in the alternative, for a new trial. (Doc. 543.) In that motion, Autoliv Japan argued that the $100 million award of punitive damages was unauthorized by the evidence as a matter of Georgia law. (*Id.* at 2-13.) And in any event, Autoliv Japan contended, the award of punitive damages was grossly excessive and amounted to a denial of due process under the United States Constitution and the Georgia Constitution, as well as a violation of the Excessive Fines Clause of the Georgia Constitution. (*Id.* at 13-27.) In connection with its due process argument,

Autoliv Japan noted that the ratio of punitive damages ($100 million) to compensatory damages (approximately $1 million) awarded to the estate was 100:1 (or nearly 50:1 if the approximately $1 million in compensatory damages apportioned to Mazda were included), well in excess of the 4:1 ratio that, the United States Supreme Court has said, "might be close to the line of constitutional impropriety." (*Id.* at 23-25 (citing *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003).) Autoliv Japan also argued that the district court erred in its award of punitive damages by looking to the financial condition of Autoliv, Inc. (*Id.* at 30-32.)

Autoliv Japan further argued that the district court should apportion fault to former defendant Bosch, explaining that the evidence showed that had Bosch been a defendant at trial, it—by virtue of supplying an indisputably defective component part—would have been liable under Georgia's strict products liability statute, just as Autoliv Japan was for supplying the subject seatbelt. (Doc. 534 at 33.) Autoliv Japan argued that, in these circumstances, holding it strictly liable, but not apportioning *any* fault to Bosch, would be a manifest injustice. (*Id.*)

The district court ultimately rejected all of these arguments. (Doc. 586.) It rejected the contention that punitive damages were not

authorized by the evidence as a matter of Georgia law, stating simply that it was "unable to conclude that the judgment contains plain or manifest errors of law or fact." (*Id.* at 11.) It rejected the argument that the award of punitive damages was unconstitutionally excessive, finding that there were indicia of reprehensibility (*id.* at 15), the ratio of punitive damages to compensatory damages was only 3.7:1[21] (*id.* at 21), and the award did not work a denial of due process. (*Id.* at 15-23.) The district court summarily rejected the contention that the award violated the Excessive Fines Clause of the Georgia Constitution. (*Id.* at 23-24.) And with respect to its consideration of Autoliv, Inc.'s financial circumstances as a basis for the award, the district court simply stated that it "adheres to its ruling on the motion in limine."[22] (*Id.* at 24.) Finally, regarding

---

[21] To calculate the ratio, the district court counted as "compensatory damages" not only the compensatory damages awarded to the estate, but also the value of life damages awarded to Ms. Andrews herself in connection with her wrongful death claim. (Doc. 586 at 18-19.) As Autoliv Japan explains in this brief, that resulted in an overestimation of the compensatory damages and an underestimation of the punitive damages.

[22] Ms. Andrews also filed a motion to amend the judgment. (Doc. 536.) The district court granted that motion in part (concluding that Ms. Andrews was entitled to approximately $4.7 million in prejudgment interest) and denied it in part (rejecting argument that Autoliv Japan should be liable for damages apportioned to Mazda). (Doc. 586 at 26.) The

apportionment to Bosch, the district court "declin[ed]to find clear error or manifest injustice as asserted by [Autoliv Japan]." (*Id.*)

## C.    Statement of Scope of Review

This Court reviews the propriety and constitutionality of an award of punitive damages *de novo,* although it defers to factual findings by the district court unless clearly erroneous. *See Williams v. First Advantage LNS Screening Solutions Inc.,* 947 F.3d 735, 744 (11th Cir. 2020); *Myers v. Cent. Fla. Invs., Inc.,* 592 F.3d 1201, 1212 (11th Cir. 2010). This Court reviews a decision by a district court to pierce the corporate veil *de novo. United States v. Fid. Cap. Corp.,* 920 F.2d 827, 836 (11th Cir. 1991).

## III.    SUMMARY OF THE ARGUMENT

The award of $100 million in punitive damages against Autoliv Japan simply cannot survive the exacting scrutiny that this Court must apply to the award in this appeal.

*First,* even when the evidence is viewed in the light most favorable to the award, it does not come close to establishing the sort of extreme and egregious culpability that would be necessary under Georgia law to

---

district court subsequently amended its judgment to add the prejudgment interest. (Doc. 587.)

authorize a $100 million award of punitive damages. Indeed, the evidence does not *clearly and convincingly* establish that Autoliv Japan supplied the seatbelt for the 2005 Mazda 3 with an *entire* want of care indicative of conscious *indifference* to consumer safety, and for this reason, no punitive damages at all were authorized. To the contrary, the evidence shows that the seatbelt complied with federal safety regulations, and that is evidence of at least some care.

Moreover, the evidence shows that seatbelt design inherently involves an engineering tradeoff between the risk and mitigation of head and thoracic injuries respectively, and in light of that tradeoff, Autoliv Japan gave Mazda—a sophisticated automobile manufacturer—three seatbelt options for the 2005 Mazda 3. Mazda selected the option with the low deployment threshold. As Mazda was aware, the choice of another seatbelt offered by Autoliv Japan might have reduced the risk of head injuries, but only by increasing the risk of thoracic injuries. But there is no evidence that Mr. Andrews would have survived the crash with another of these seatbelt options, and in fact, the evidence suggests that he only would have avoided serious head injury with the use of a stop— which is not commonly used in the automotive industry—that would

23

have exposed him to serious thoracic injury in his crash. There is no evidence that Autoliv Japan was motivated by profit to steer Mazda to the seatbelt that it ultimately selected, nor is there any evidence of other incidents—similar to Mr. Andrews' crash—that would have led Autoliv Japan to conclude that the seatbelt might be unreasonably dangerous.

In these circumstances, it is one thing for a court to say that the design of the seatbelt in the 2005 Mazda 3 was defective and to hold Autoliv Japan strictly liable for compensatory damages. It is quite another to say that striking the balance unreasonably—in a way that afforded greater protection to consumers from thoracic injuries, albeit by exposing consumers to an increased risk of head injuries—reflects a wanton or conscious indifference to consumer safety. Under settled principles of Georgia law, no award of punitive damages at all was warranted in this case. And in any event, a $100 million award does not meet the reasonable proportionality requirement of Georgia law.

*Second*, even if some award of punitive damages were authorized, a $100 million award is grossly excessive and amounts to a denial of the due process that is constitutionally guaranteed. Even if there were some indicia of reprehensible conduct by Autoliv Japan in this case, the

evidence does not establish the *high degree* of reprehensibility that would justify a $100 million award of punitive damages. Equally important, the ratio of the punitive damages to the compensatory damages awarded against Autoliv Japan to Mr. Andrews' estate is 100:1, far in excess of the 4:1 ratio that, the United States Supreme Court has said, "might be close to the line of constitutional impropriety." *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425 (2003). The award simply cannot survive serious constitutional scrutiny.

*Finally*, the district court explicitly based the amount of the punitive damages award against Autoliv Japan on the financial condition of its parent company without any showing that the parent had abused the corporate form. Georgia law does not authorize the corporate veil to be pierced so easily in the context of punitive damages, and the district court's reliance on the financial circumstances of the parent company was error. For all these reasons, the award of punitive damages cannot stand.

## IV.  ARGUMENT AND CITATION OF AUTHORITY

### A.  The $100 million award of punitive damages in this case is excessive and not authorized by Georgia law.

The district court was not authorized under Georgia law to award $100 million in punitive damages against Autoliv Japan. Indeed, the

evidence presented at trial does not *clearly and convincingly* establish sufficient grounds for any award of punitive damages at all. But in any event, it certainly does not show the sort of egregious culpability that would be required under Georgia law to sustain an award of $100 million in punitive damages. The award is disproportionate to any wrongdoing and is not authorized by Georgia law.

### 1.    *The limits of punitive damages under Georgia law.*

Fundamental and settled principles of Georgia law limit punitive damages in three significant respects pertinent to this case. *First,* although courts are authorized generally in appropriate cases sounding in tort to award punitive damages, they may *not* award punitive damages for wrongful death. *Second,* punitive damages are authorized only to the extent that a tort is accompanied by certain aggravating circumstances, which must be proved clearly and convincingly. *Third,* any award of punitive damages must be proportional to the tort, the injury sustained as a result of the tort, and the peculiar culpability of the defendant. In light of these limits, a $100 million award of punitive damages against Autoliv Japan in this case is grossly excessive and cannot be sustained under Georgia law.

a.    *Punitive damages cannot be awarded upon a claim for wrongful death.*

In tort cases generally, the ordinary measure of damages under Georgia law is "compensation to the plaintiff for the actual injury inflicted," *Golden Pantry Food Stores v. Lay Bros., Inc.,* 597 S.E.2d 659, 663 (Ga. App. 2004), and in appropriate cases, additional damages to deter the wrongdoer—punitive damages, that is—also may be awarded. *See* O.C.G.A. § 51-12-5.1(a). But in wrongful death cases, the ordinary measure of damages is different—the "full value of the life of the deceased," irrespective of its value to the survivor-plaintiff, and without any deduction for "any of the necessary or personal expenses of the decedent had he lived," *Bibbs v. Toyota Motor Corp.,* 815 S.E.2d 850, 859 (Ga. 2018)—and additional, punitive damages may *not* be awarded. Indeed, for nearly a century, it has been settled law that additional, punitive damages are categorically disallowed for wrongful death in Georgia. *See Engle v. Finch,* 139 S.E. 868, 869 (Ga. 1927).[23] The ordinary measure of damages for wrongful death is itself punitive, *see Savannah Elec. Co. v. Bell,* 53 S.E. 109, 112 (Ga. 1906), and intended to "mak[e]

---

[23] *See also Ford Motor Co. v. Stubblefield,* 319 S.E.2d 470, 480 (Ga. App. 1984).

homicide expensive."[24] *Western & Atl. R. Co. v. Michael,* 165 S.E. 37, 42 (Ga. 1932). For this reason, the Georgia Supreme Court has explained, an award of additional, punitive damages for wrongful death would amount impermissibly to a "double penalty." *Engle,* 139 S.E. at 869.

      b.   *Punitive damages can be awarded only to the extent that aggravating circumstances are proved clearly and convincingly.*

Under Georgia law, punitive damages are authorized only in cases "in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). Pertinent to this case, even slight care is more than an "entire want of care," and so, neither negligence nor gross negligence is

---

[24] The Georgia Supreme Court has acknowledged that an award of damages for wrongful death in some cases may incidentally serve a compensatory purpose, but that "is not the primary object of the [wrongful death] statute." *Savannah Elec. Co.,* 53 S.E. at 112. Instead, damages for wrongful death are "primarily to punish the defendant for its negligence in bringing about the death of a human being." *Id.* In the context of the Federal Tort Claims Act, the former Fifth Circuit recognized that an award of damages for wrongful death in Georgia is, at least, "partly punitive." *Harden v. United States,* 688 F.2d 1025, 1029 (5th Cir. 1982).

enough, without more, to raise a "presumption of conscious indifference to consequences." *See Banks v. ICI Ams., Inc.,* 469 S.E.2d 171, 175 (Ga. 1996). *See also S. Ry. Co. v. O'Bryan,* 45 S.E. 1000, 1000 (Ga. 1903) ("Mere negligence can never amount to such aggravating circumstances as to warrant the imposition of such damages; and this is true though the negligence be gross."). A "conscious indifference to consequences" "relates to an intentional disregard of the rights of another, knowingly or willfully disregarding such rights," and it excludes conduct that is wrongful but nonetheless based on "good faith and honest belief." *Gilman Paper Co. v. James,* 219 S.E.2d 447, 450 (Ga. 1975).

      c.    *An award of punitive damages must be in reasonable proportion to the wrong, the harm, and the culpability of the defendant.*

As a matter of state constitutional law, punitive damages generally must be reasonably proportional to the tort for which they are imposed, the injury sustained as a result of the tort, and the peculiar culpability of the defendant. The Georgia Constitution expressly forbids the imposition of "excessive fines," Ga. Const. art. I, § I, para. XVII, and in *Colonial Pipeline Co. v. Brown,* 365 S.E.2d 827 (Ga. 1988), a plurality of the Georgia Supreme Court concluded that this constitutional prohibition

"applies to the imposition of punitive damages in civil cases."[25] *Id*. at 831. To survive constitutional scrutiny, the *Colonial Pipeline* plurality said, an award of punitive damages must reflect a "rational relationship between the offense and the punishment." *Id*. at 833. And to assess whether the award at issue in *Colonial Pipeline* met this standard, the plurality examined the nature and extent of both the wrongdoing and the harm, as well as the ratio of punitive to actual damages. *See id*. Concluding that the award of punitive damages was not reasonably proportional to the wrong, the plurality reversed the award. *See id*. Three years later, a majority of the Georgia Supreme Court seemingly endorsed this approach, with the caveat that a comparison of punitive to actual damages may carry less or no weight in a case in which the actual harm to the plaintiff was "slight," but the potential for harm was substantial.

---

[25] Although *Colonial Pipeline* is only a plurality decision—the lead opinion was joined by three of the then-seven members of the court— subsequent majority decisions have cited *Colonial Pipeline* approvingly. *See, e.g., Democratic Party of Ga. v. Perdue,* 707 S.E.2d 67, 74 & n.12 (Ga. 2011) (citing *Colonial Pipeline* as instance in which "this Court has recognized greater protection extended under the Georgia Constitution than under the federal constitution"); *Powell v. State,* 510 S.E.2d 18, 22 n.3 (Ga. 1998) (same).

*See Hosp. Auth. of Gwinnett Cnty. v. Jones,* 409 S.E.2d 501, 503 (Ga. 1991).[26]

>   **2.  *The evidence presented at trial does not clearly and convincingly establish a sufficient basis under Georgia law for any award of punitive damages, much less an award of $100 million.***

In this case, the district court awarded punitive damages based on its conclusion that "Autoliv's conduct in designing, manufacturing, and selling the subject seatbelt showed 'that entire want of care which would raise the presumption of conscious indifference to consequences.'" (Doc. 534 at 4.) But even viewed in the light most favorable to decision below, the evidence simply does not *clearly and convincingly* establish an *entire want of care* suggestive of a *conscious indifference* to consequences, as those terms are used in O.C.G.A. § 51-12-5.1(b) and the Georgia precedents. For this reason, the award of punitive damages should be set aside altogether.

---

[26] Before the Georgia Supreme Court recognized the proportionality principle as a matter of constitutional law, it rejected the notion that a proportionality limit arises from statutory or common law in cases in which punitive damages are awarded to deter wrongdoers. *See Smith v. Milikin,* 276 S.E.2d 35, 37-38 (Ga. 1981).

To begin, the Georgia Supreme Court has said that "punitive damages, the purpose of which is to punish, penalize or deter, are, as a general rule, improper where a defendant has adhered to [applicable] safety regulations." *Stone Man v. Green*, 435 S.E.2d 205, 206 (Ga. 1993) (cleaned up). Indeed, compliance with regulations "tend[s] to show that there is no clear and convincing evidence of . . . that entire want of care which would raise the presumption of conscious indifference to consequences." *Id.* at 206 (cleaned up). *See also Welch v. Gen. Motors Corp.*, 949 F. Supp. 843, 844-46 (N.D. Ga. 1996). This is especially so, the Georgia Supreme Court elaborated, in contexts in which some risk of the pertinent harm is unavoidable. *See Stone Man*, 435 S.E.2d at 206.

Here, it is undisputed that the seatbelt in question complied with all applicable federal safety regulations, and this regulatory compliance is at least some evidence of due care by Autoliv Japan. Moreover, the evidence at trial was undisputed that design decisions about seatbelt payout inevitably involve an engineering tradeoff between the respective risks of serious head and thoracic injuries. Minimizing payout to reduce the risk of serious head injuries necessarily increases the risk of thoracic injuries, and increasing payout to reduce the risk of serious thoracic

injuries increases the risk of head injuries. As in *Stone Man,* some risk of injury is unavoidable in this context, and that circumstance makes the undisputed fact of regulatory compliance—and the 4-star NCAP rating— even more compelling. *See also Nissan Motor Co. v. Maddox,* 486 S.W.3d 838, 843 (Ky. 2015) (citing *Stone Man* in seatbelt defect case and holding that compliance with federal safety regulations "is, at the very least, facial evidence of exercising slight care," precluding punitive damages).

To be sure, regulatory compliance alone does not absolutely foreclose punitive damages, and when other evidence strongly shows wanton or conscious indifference to consumer safety, punitive damages may still be authorized. For instance, Georgia courts have allowed punitive damages notwithstanding regulatory compliance in cases in which a manufacturer was motivated solely or principally by profit to implement a product design that endangered consumers. *See, e.g., Mack Trucks, Inc. v. Conkle,* 436 S.E.2d 635, 640 (Ga. 1993); *Gen. Motors Corp. v. Moseley,* 447 S.E.2d 302, 311-12 (Ga. App. 1994) (physical precedent only); *Mascarenas v. Cooper Tire & Rubber Co.,* 643 F.Supp.2d 1363, 1377-78 (S.D. Ga. 2009). Here, there was *no* evidence that Autoliv Japan was motivated by profit to sell a low deployment threshold seatbelt with

no stop, as opposed to the other, higher deployment threshold seatbelts that it offered Mazda.

Punitive damages may also be authorized where a manufacturer knows of actual incidents and injuries involving the use of its product, which lead to awareness that the product is unreasonably unsafe, notwithstanding compliance with regulatory requirements. *Cf. Uniroyal Goodrich Tire Co. v. Ford,* 461 S.E.2d 877, 884 (Ga. App. 1995) (rejecting claim for punitive damages where tire manufacturer complied with regulatory requirements and "there was no evidence that the SP-7000 tire had previously caused an injury"), *reversed in part on other grounds,* 476 S.E.2d 565 (Ga. 1996). There likewise was no evidence presented in this case of similar incidents and injuries involving the driver seatbelt of the 2005 Mazda 3. The absence of such evidence is all the more conspicuous considering that, by the time of trial, the vehicle had been on the roads for more than 15 years.

Regulatory compliance notwithstanding, the district court in this case found "an entire want of care which would raise the presumption of

conscious indifference" based primarily on failure to warn evidence[27] in a case in which the plaintiff did not even allege that the defendant was *negligent* in failing to warn (*see Andrews*, 715 F. App'x at 967). The district court also found "an entire want of care" in evidence that Autoliv Japan knew not only that airbags sometimes fail to deploy, but also, if an airbag failed to deploy in circumstances like Mr. Andrews' crash, the seatbelt could spool out as much as 20 inches of webbing, putting the occupant at risk of a serious head injury. (Doc. 534 at 83-84.) In other words, Autoliv Japan knew that the low deployment threshold design of the seatbelt would create a risk of serious head injury in a particular circumstance. But there was *no* evidence presented about the frequency with which airbags fail to deploy in crash events presenting a materially similar risk of serious head injury, so the magnitude of the risk is unknown.[28] On the other hand, the evidence quite clearly established

---

[27] Doc. 534 at 82-83 ("[T]here is evidence that shows willful misconduct and that entire want of care that would raise the presumption of conscious indifference to the consequences. . . . Said evidence is the fact Autoliv did not warn any foreseeable users/consumers of the product, such as Mr. Andrews, of the dangers of the product.").

[28] About the frequency of airbag failures, it is telling that NHTSA does not require *any* crash testing in which an airbag does not deploy, and automobile manufacturers only conduct such testing "once in a blue moon, but very rare[ly]." (Doc. 600 at 87:17-88:1; Doc. 601 at 108:11-

that seatbelt payout—and design choices that drive payout—reflect an engineering tradeoff between the avoidance or mitigation of the risks of serious head injuries and serious thoracic injuries. The elimination of all such risks is not feasible, especially to the extent that an airbag—with which the load-limiting seatbelt is intended to function—fails to deploy.

It is one thing for a court to say that a manufacturer like Autoliv Japan struck the balance between the potential harms unreasonably, exposing it to strict liability for defective design. It is quite another to say that striking the balance unreasonably—in a way that afforded greater protection to consumers from thoracic injuries, albeit by exposing consumers to an increased risk of head injuries—reflects a wanton or conscious indifference to consumer safety. *Cf. Vazquez v. Raymond Corp.*, 2019 WL 176106, at *7 (N.D. Ga. Jan. 11, 2019) (testimony by "engineers who disagree with Defendant's choice in trading one danger for another is not enough [to establish a punitive damages claim]" where the forklift at issue was "designed in compliance with all applicable standards and regulations"). *See also Hernandez v. Crown Equip. Co.,* 92 F. Supp. 3d

109:20; Doc. 552 at 53:6-10.) Conversely, NHTSA does require crash testing without a seatbelt. (Doc. 601 at 109:9-20; Doc. 552 at 52:12-53:18.)

1325, 1357 (M.D. Ga. 2015) (even considering 741 prior accidents, where design decisions were driven by engineering considerations—weighing "the benefits of a particular design against the possibility that other risks might be increased"—Georgia law did not permit punitive damages). That is especially true in the absence of evidence about the frequency with which circumstances arise that present the risk in question. *See Welch*, 949 F. Supp. at 845-46 (punitive damages unavailable where danger posed by brake problems would be realized only in limited circumstances, and limited evidence of brake problems showed the risk to be "at best de minimis or statistically negligible"). *Cf. Ford Motor Co. v. Sasser*, 618 S.E.2d 47, 56-59 (Ga. App. 2005).

The fact that Autoliv Japan supplied the subject seatbelt to a sophisticated consumer who was fully aware of alternative options and made the final design decisions also indicates that the company did not act with wanton or conscious indifference. Indeed, it is undisputed that Mazda's engineers, prior to production of the subject vehicle, were well aware of the ability to use a higher load limiting threshold or a stop in the subject seatbelt. (Doc. 620-42 (Pl. Trial Ex. 126) at 1; Doc. 617-7 (Def. Trial Ex. 100) at 1; Doc. 600 at 112:4-7; Doc. 550 at 123:15-124:20; Doc.

601 at 123:16-125:5; Doc. 552 at 63:1-15.) And Ms. Andrews' own seatbelt expert admitted that Mazda's engineers were similarly aware that a load limiter with a higher deployment threshold provides more restraint on the occupant and less forward excursion than a load limiter with a lower deployment threshold. (Doc. 601 at 123:16-125:5.) But in the end, Autoliv Japan provided Mazda with "high," "medium," and "low" deployment threshold options, and Mazda—aware of the test results,[29] and as the vehicle manufacturer, the party best situated to determine how the various components of the occupant restraint system will complement one another (Doc. 551 at 5:18-6:22; Doc. 552 at 31:20-23, 34:1-36:4)—directed Autoliv Japan to provide the "low" option. (Doc. 534 at 80.)

In sum, evidence that Autoliv Japan knew that airbags sometimes fail to deploy (in unspecified circumstances and with unknown frequency)

---

[29] In its final judgment, the district court emphasized an exhibit reflecting a January 2002 email from Mazda to Autoliv Japan, in which Mazda noted that "bottoming" of a dummy's head "occurred on the [steering] wheel" during computed simulated testing. (Doc. 534 at 31-32, 34, 36, 75, 83-84; Doc. 620-43 (Pl. Trial Ex. 128); Doc. 551 at 18:1-19:21.) On page two of this exhibit, Autoliv Japan responded to Mazda, indicating that the computer testing (and thus Mazda's concerns) might be misplaced because it appeared that the testing involved a simulated crash at 56 mph, an unusually severe speed that is not commonly tested. (*See* Doc. 620-43 (Pl. Trial Ex. 128) at 2; Doc. 551 at 19:14-21:11; Doc. 601 at 115:18-20.)

and that, *if* an airbag failed in certain circumstances, the extent of pay out permitted by the subject seatbelt would fail to protect a consumer from a head-impact injury does not show wanton or conscious indifference to consumer safety in light of the other circumstances of this case. Those circumstances include the absence of evidence indicating that Autoliv Japan's decision to offer alternative seatbelt choices to Mazda was driven by financial considerations, as well as affirmative evidence showing that the chosen seatbelt design complied with all applicable federal regulations, that increasing the deployment threshold (or including a stop) would *increase* the risk of thoracic injuries in other circumstances, that Autoliv Japan gave Mazda choices for its seatbelt, that Mazda was aware of the restraint features of the seatbelt ultimately used in this case, and that Mr. Andrews could have only survived the subject accident with the implementation of a "stop"—a seatbelt design feature that is not even commonly used. Georgia courts have never held circumstances like these authorize an award of punitive damages, and this Court should reverse the award of punitive damages in its entirety.

3.   **The award of $100 million in punitive damages is unconstitutionally excessive under Georgia law and bears no rational relationship to the wrong.**

Considering the nature of the wrongdoing, the nature and extent of the harm, and the peculiar culpability of Autoliv Japan, an award of $100 million in punitive damages bears no rational relationship to the wrong, and the award, therefore, is forbidden by the Excessive Fines Clause of the Georgia Constitution. To be sure, the wrong concerns an automotive product that the district court found to be defectively designed, and it implicates consumer safety. But there was no evidence of materially similar incidents involving the same seatbelt—although the 2005 Mazda 3 has been on the roads for years—and no evidence of the frequency with which airbags fail to deploy in materially similar circumstances. Moreover, although Mr. Andrews lost his life in the crash, his death is *not* an injury upon which punitive damages can be awarded under Georgia law. *See Engle,* 139 S.E. at 869. Indeed, Georgia has a distinct "punishment" for wrongful death—the award of damages for the full value of the life of the decedent, *see id.*—and the district court separately imposed that "punishment" in the amount of $12.5 million apportioned to Autoliv Japan. (Doc. 534 at 96.)

40

Moreover, as the foregoing section illustrates, strong evidence of a high degree of culpability on the part of Autoliv Japan is conspicuously absent in this case. And the award of punitive damages to the estate ($100 million) is grossly disproportionate to the value of the actual damages that the district court found Mr. Andrews to have sustained prior to his death ($2.019 million). In these circumstances, the award of punitive damages bears no reasonable relationship to the wrong, and it cannot be sustained as a matter of Georgia constitutional law. *See Colonial Pipeline,* 365 S.E.2d at 833.

## B.  A $100 million award of punitive damages in this case is grossly excessive and amounts to a denial of due process.

Even if Georgia law otherwise authorized a $100 million award of punitive damages in this case, the award would be grossly excessive and work a denial of due process. The constitutional guarantee of due process "prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996). In assessing whether a punitive damages award is excessive for due process purposes, the U.S. Supreme Court has identified three "guideposts" to which courts should look:

(1) [T]he degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the [trial court] and the civil penalties authorized or imposed in comparable cases.

*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418 (2003). *See also BMW,* 517 U.S. at 574-75. In reviewing an award of punitive damages, this Court undertakes an "[e]xacting appellate review." *State Farm,* 538 U.S. at 418.

### 1.    *Reprehensibility*

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW,* 517 U.S. at 575.

[E]xemplary damages imposed on a defendant should reflect the enormity of his offense. This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that nonviolent crimes are less serious than crimes marked by violence or the threat of violence. Similarly, trickery and deceit are more reprehensible than negligence.

*Id.* at 575-76 (cleaned up). While "reprehensible conduct alone can justify a punitive damages award," punitive damages should only be awarded "if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to

achieve punishment or deterrence." *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 750-51 (11th Cir. 2020) (cleaned up).

In assessing the degree of reprehensibility, the Supreme Court has directed courts to look to four factors pertinent here:

- Whether the wrong produced physical or economic harm;

- Whether the wrong reflected indifference to, or reckless disregard of, health or safety;

- Whether the defendant engaged in the wrongful conduct repeatedly, with knowledge of its wrongfulness; and

- Whether the wrong involved malice, trickery, or deceit.[30]

*BMW*, 517 U.S. at 576-77. No fair view of the evidence in this case suggests a *high* degree of reprehensibility. Indeed, while this case certainly involves grave physical injury, the other three factors do not suggest a degree of reprehensibility sufficient to justify an award of $100 million in punitive damages.[31]

---

[30] A fifth factor—the financial vulnerability of the victim—"is not particularly relevant in a mostly noneconomic damages case like this one." *Hardeman v. Monsanto Co.*, 997 F.3d 941, 973-74 (9th Cir. 2021). *See also Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1066 (10th Cir. 2016).

[31] *See BMW*, 517 U.S. at 580 ("That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages[,] does not establish the high degree of culpability

*Indifference to safety.* Certainly, this case involves an essential safety device that the district court found to have been defectively designed. But it is undisputed that the seatbelt met federal regulatory standards (Doc. 534 at 81), which is evidence of at least slight care. Moreover, the evidence establishes that the design of a seatbelt with respect to payout necessarily reflects an engineering tradeoff between the prevention of head injuries, on the one hand, and the avoidance of serious thoracic injuries caused by the seatbelt itself, on the other.[32] (Doc. 600 at 45:5-22, 69:12-70:15; Doc. 601 at 113:11-115:10, 124:3-22.) In addition, Autoliv Japan provided Mazda—a sophisticated and knowledgeable consumer and the party best positioned to select the components of the occupant restraint system for the 2005 Mazda 3[33] (Doc. 551 at 5:18-6:22;

_____

that warrants a substantial punitive damages award."). *See also Lompe*, 818 F.3d at 1066-67 (examining the second, fourth, and fifth factors, and stating that although evidence showed some degree of indifference to safety concerns and repeated failures to act, "we cannot ignore the evidence that distances [the defendant]'s misconduct from the 'extreme reprehensibility' end of the constitutional reprehensibility spectrum in the due process analysis") (cleaned up).

[32] Indeed, Ms. Andrews' own biomechanics expert testified that it is "unfortunate[]," but "there's always a tradeoff; you gain a little bit here and you have to give up a little bit there." (Doc. 600 at 45:13-18.)

[33] As the vehicle manufacturer, Mazda is the only entity that has the entire vehicle and can crash test the vehicle to measure how all of its

Doc. 552 at 31:20-23, 34:1-36:4)—with "high," "medium," and "low" deployment threshold options, and Mazda selected the "low" option, while well aware of the ability to use—and the engineering consequences associated with using—a higher threshold or a stop in the subject seatbelt. (Doc. 534 at 80; Doc. 620-140 (Pl. Trial Ex. 1163) at 97:14-19; Doc. 617-3 (Def. Trial Ex. 42) at 11; Doc. 601 at 123:16-125:5; Doc. 600 at 112:4-7.) The evidence simply does not suggest indifference to consumer safety.

*Repeated misconduct.* This case does not involve "repeated" misconduct in the sense that it involves only the design of one seatbelt for one vehicle. But in any event, this indicium of reprehensibility is not merely conduct that occurs more than once. It instead requires "evidence that a defendant has repeatedly engaged in prohibited conduct while *knowing or suspecting* that it was unlawful [that] would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *BMW*, 517 U.S. at 576-77 (emphasis added). And here, there was no evidence that Autoliv Japan at any

---

various restraint system components perform together. (Doc. 552 at 34:1-36:4.)

relevant time knew or suspected the seatbelt in the 2005 Mazda 3 to be unreasonably dangerous. Although Autoliv Japan knew the seatbelt would spool out substantially in the event of an airbag failure (Doc. 534 at 79), there is no evidence of the frequency with which airbags fail to deploy in general, much less in crashes materially similar to this one. There is no evidence of prior incidents similar to this one. And the seatbelt at issue not only met federal regulatory requirements, but seatbelts with the same deployment threshold previously had been used by other carmakers. (Doc. 534 at 81; Doc. 620-140 (Pl. Trial Ex. 1163) at 96:20-97:4.)

*Malice, trickery, or deceit.* There is *no* evidence that Autoliv Japan intended any harm to come to the occupants of any vehicle or that it employed any trickery or deceit in the sale of the seatbelt at issue.[34]

---

[34] In its order denying Autoliv Japan's motion to amend the judgment, the district court found with respect to this factor that "the harm was not the result of mere accident" (Doc. 586 at 14-15), based apparently on the testimony of an Autoliv Japan witness, who conceded that airbags sometimes may fail to deploy, that Autoliv Japan knew that substantial payout would occur if an airbag did not deploy, and that neither Mazda nor Autoliv Japan was "concerned" by the end of the design process about the payout. (Doc. 534 at 83-84.) The district court confused the reprehensibility factors; this testimony certainly does not show *malice*.

*The reprehensibility factors as a whole.* Although this case certainly involves a grave physical injury—and even if the evidence showed some indifference to safety issues (it does not)—the facts do not indicate a *high* degree of reprehensibility. Importantly, reprehensibility is not binary, but rather, is a question of degree. *See BMW,* 517 U.S. at 580. *See also Watson v. Johnson Mobile Homes,* 284 F.3d 568, 572 (5th Cir. 2002). Nothing about this case suggests that it involves the sort of extreme culpability that would sustain a $100 million award of punitive damages.

### 2.    *Ratio of Punitive Damages to Compensatory Damages*

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW,* 517 U.S. at 580 (cleaned up). The Supreme Court has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," and it has declined to "impose a bright-line ratio which a punitive damages award cannot exceed." *State Farm*, 538 U.S. at 424-25 (cleaned up). But it has said that "a ratio greater than 4:1 between punitive and compensatory damages will likely be close to the line of constitutional impropriety," and "few awards

47

exceeding a single-digit ratio [that is, anything greater than a 9:1 ratio] to a significant degree will satisfy due process." *Williams*, 947 F.3d at 750. In doing so, however, the Supreme Court has emphasized that:

> [t]hese are not hard and fast rules. Sometime even a 4:1 ratio may be too great. If, for example, the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect. On the other hand, if a particularly egregious act has resulted in only a small amount of compensatory damages, then a greater ratio can be justified.

*Id.* at 754-55.

### a.    The Relevant Amount of Compensatory Damages

To calculate the ratio of punitive damages to actual damages, this Court should consider only those damages awarded by the district court to the Estate of Micah Lee Andrews and assessed against Autoliv Japan. Recall that this case involves claims by two distinct real parties in interest—a claim for ordinary tort damages by the estate, and a claim for value of life damages by Ms. Andrews personally—and that the district court apportioned these damages equally between Autoliv Japan and Mazda. The district court valued the tort damages sustained by the estate—mostly damages for pain and suffering—at approximately $2

million, it determined that Ms. Andrews should recover $25 million for the value of her late husband's life, and it entered judgment against Autoliv Japan for 50 percent of these amounts. (Doc. 534 at 96.) The district court then awarded $100 million in punitive damages to the estate. (*Id.*)

The value of life damages for wrongful death are irrelevant to the constitutional ratio. In the first place, they were not awarded to the real party in interest—the estate—that was awarded punitive damages. *See Planned Parenthood of the Columbia/Williamette, Inc. v. Am. Coalition of Life Activists,* 422 F.3d 949, 961-62 (9th Cir. 2022). More important, punitive damages are categorically unavailable for wrongful death in Georgia, *see Engle*, 139 S.E. at 869,[35] precisely because the ordinary measure of damages for wrongful death is intended to be punitive, even if it incidentally amounts to compensation in some cases. *See Savannah Elec. Co.,* 53 S.E. at 112. To allow additional punitive damages on a wrongful death claim would, the Georgia Supreme Court has said, impose upon the defendant "a double penalty." *Engle,* 139 S.E. at 869.

---

[35] *See also Sw. R.R. Co. v. Paulk*, 24 Ga. 356, 366 (1858); Robert E. Cleary, Jr., Eldridge's Georgia Wrongful Death Actions § 6:2 (4th ed. 2022).

Georgia has determined to punish wrongful death by a means other than punitive damages. And for the wrongful death of Mr. Andrews, the district court separately imposed that distinct punishment upon Autoliv Japan by way of a substantial award of value of life damages. To count the wrongful death damages intended by Georgia law to punish Autoliv Japan as compensatory for purposes of calculating the constitutional ratio would grossly overstate the "actual" damages and, at the same time, understate the "punitive" damages in this case. For these reasons, the Court should consider only the damages sustained by the *estate* in assessing the constitutional ratio. *See Action Marine, Inc. v. Cont'l Carbon, Inc.,* 481 F.3d 1302, 1321 (11th Cir. 2007) (looking to state law to determine whether particular components of damages award should be considered "compensatory" for purposes of constitutional ratio). *See also Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1044 (9th Cir. 2003) (calculating ratio using only compensatory damages awarded on claim for which punitive damages were awarded and without damages awarded under statute authorizing double damages).[36]

---

[36] *See also Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001) ("We believe that it is appropriate to construct the ratio by looking only to the count on which punitive damages were awarded . .

Moreover, as to the damages sustained by the estate, this Court should consider only those damages apportioned to Autoliv Japan. *See Lompe,* 818 F.3d at 1068 (for constitutional ratio purposes in a case in which compensatory damages are apportioned, the proper comparison is the proportion of punitive damages to a "[d]efendant's individual portion of the total compensatory damages"). For purposes of the constitutional ratio, the compensatory damages in this case are approximately $1 million—the combined amount of special and general damages awarded to the estate and against Autoliv Japan.

### b.    The Ratio

When counting only the damages awarded to the estate and against Autoliv Japan, the ratio of punitive damages to compensatory damages

---

. ."); *Ishimatsu v. Royal Crown Ins. Corp.*, 2010 MP 8, ¶¶ 35-36, N. Mar. I. 424, 439 (2010) (eliminating compensatory damages awarded on claims for which punitive damages were not available in calculation of ratio); *Dubey v. Pub. Storage, Inc.*, 918 N.E.2d 265, 282 (Ill. App. Ct. 2009) (separately calculating constitutional ratios for punitive and compensatory damages awarded on separate claims); *cf. Audiotext Commc'ns Network v. US Telecom*, No. 94-2395-GT, 1996 WL 568839, at *8 (D. Kan. Sep. 4, 1996) (under Florida statute presumptively limiting punitive damages to three times the amount of compensatory damages, "[i]t is implicit under the statute that the calculation of the appropriate amount of punitive damages should be limited to compensatory damages awarded on claims upon which the claimant is entitled to punitive damages").

is approximately 100:1.[37] And even if the damages awarded to the estate and apportioned to Mazda were included, the ratio still would be nearly 50:1.[38] Either way, the ratio reflects a punitive damages award that is grossly excessive and contrary to the constitutional guarantee of due process.[39] *See State Farm*, 538 U.S. at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."); *see also Williams*, 947 F.3d

---

[37] $100,000,000.00 : $1,009,671.70.

[38] $100,000,000.00 : $2,019,343.40.

[39] A survey of the reported decisions since *BMW* indicates that this Court has approved punitive damages awards with a ratio exceeding a single-digit multiplier in only three cases, all involving very different circumstances than those presented here, and all involving substantially smaller awards. *See, e.g., Kemp v. AT&T*, 393 F.3d 1354, 1365 (11th Cir. 2004) (finding $1 million punitive award excessive in a state racketeering case with $115 award of compensatory damages, but concluding that $250,000 in punitive damages would pass constitutional muster because anything less "would not serve as a meaningful deterrent to a corporation like AT&T"); *U.S. EEOC v. W&O Inc.*, 213 F.3d 600, 616-17 (11th Cir. 2000) (affirming $100,000 punitive awards for employees with compensatory damages of only $3,800 and $6,225 in employment discrimination case, noting that "the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify ratios higher than might otherwise be acceptable"); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339-40 (11th Cir. 1999) (affirming $4.35 million punitive award in environmental pollution case in which total actual damages of several property owners was only $47,000).

at 755 (holding that a 13:1 ratio "raise[d] a red flag that the punitive damage amount likely violates the due process clause"). Although the Supreme Court has left some room for the possibility of a constitutionally permissible double-digit ratio in cases involving uncommonly extreme culpability, this is not such a case (as the assessment of reprehensibility above demonstrates).

Furthermore, even if the wrongful death damages were included as "compensatory" damages in the ratio, the ratio still would reflect an unconstitutionally excessive award. Indeed, including the wrongful death damages awarded against Autoliv Japan would yield a ratio of approximately 7.4:1,[40] or approximately 3.7:1 if the wrongful death damages apportioned to Mazda were included.[41]  The former ratio would be well in excess of the 4:1 ratio that, the United States Supreme Court has said, "might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425; *see also BMW*, 517 U.S. at 581; *Williams*, 947 F.3d at 755 (characterizing 4:1 ratio as "default" for "uppermost range" of punitive damages awards). And the latter ratio closely approaches 4:1.

---

[40] $100,000,000.00 : $13,509,671.70.

[41] $100,000,000.00 : $27,019,343.40.

But when compensatory damages are as substantial as $13.5 million (or $27 million)—and especially when those "compensatory" damages include wrongful death damages that are punitive in nature—even a 4:1 ratio may be constitutionally impermissible. *See State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").[42] Here, given the limited degree of reprehensibility, even a 4:1 ratio predicated on $13.5 million or $27 million in compensatory damages is unconstitutional.[43]

---

[42] The Supreme Court characterized the $1 million compensatory damages award in *State Farm* as "substantial." *See* 538 U.S. at 426; *see also Lompe*, 818 F.3d at 1069 ("[I]n cases decided since *State Farm*, compensatory damages have often been considered 'substantial' when they are over $1,000,000.").

[43] *Cf. Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding, in a wrongful death case alleging defective design of cigarettes in which the jury awarded $4 million in compensatory damages, that 1:1 ratio of punitive damages to compensatory damages was constitutionally appropriate, notwithstanding evidence of a high degree of reprehensibility, including tobacco manufacturer's efforts to mislead consumers about health risks associated with smoking); *Clark v. Chrysler Corp.*, 436 F.3d 594, 607 (6th Cir. 2006) (holding, in wrongful death case alleging defective design of pickup truck, and in which jury awarded only $236,000 in compensatory damages, that 2:1 ratio of punitive to compensatory damages marked limit of constitutional permissibility).

54

### 3.    *Other Civil Penalties Authorized by Law*

"Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, 517 U.S. at 583. "[A] reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." *Id.* (cleaned up). Here, the closest comparable penalty appears to be the civil penalty authorized under 49 U.S.C. § 30165 (a) for certain violations of the federal Motor Vehicle Safety Act or federal motor vehicle safety standards promulgated under the Act by the Secretary of Transportation. *See Clark*, 436 F.3d at 608. Because the seatbelt at issue here indisputably complied with federal automotive safety regulations, Autoliv Japan could not actually be subject to any civil penalty under 49 U.S.C. § 30165.

But even if Autoliv were subject to such a penalty, at the time of the design and manufacture of the 2005 Mazda 3, that statute authorized "a civil penalty of not more than $5,000 for each violation," and it capped the "maximum penalty under this subsection for a related series of

violations" at $15,000,000. Transp. Recall Enhancement, Accountability, and Documentation Act, Pub. L. No. 106-414, 114 Stat. 1800, § 5 (enacted Nov. 1, 2000) (amending 49 U.S.C. § 30165 (a)). The $100 million punitive award in this case, of course, substantially exceeds—and is nearly seven times—the maximum amount of aggregate civil penalties for related violations under the version of 49 U.S.C. § 30165 (a) applicable at the time of the conduct at issue. This too suggests that the punitive damages award is constitutionally excessive. *See Clark*, 436 F.3d at 608.

\*    \*    \*

For these reasons, the "three guideposts" for assessing the excessiveness of a punitive damages award under the Due Process Clause of the United States Constitution demonstrate that the Court's punitive damages award in this case is constitutionally excessive and cannot be sustained.[44] If any amount of punitive damages is appropriate in this case, it is an amount far less than the $100 million awarded by the district court. Autoliv Japan respectfully suggests that in this case, in which the district court separately awarded substantial compensatory

---

[44] The punitive damages award is also excessive, for these same reasons, under due process as guaranteed by the Georgia Constitution. *See* Ga. Const. art. I, § I, para. I.

damages and imposed the substantial penalty contemplated by Georgia law for wrongful death, a 1:1 ratio of additional, punitive damages to the compensatory damages awarded to the estate and against Autoliv Japan—approximately $1 million—would pass constitutional muster.

## C.  In awarding punitive damages, the district court improperly relied on the financial circumstances of Autoliv Japan's parent corporation.

In assessing punitive damages against Autoliv Japan, the district court improperly relied upon the financial circumstances of its parent company, Autoliv, Inc.[45] (Doc. 534 at 90-94.) The measure of punitive damages under Georgia law—subject to the constitutional limitations of such damages, of course—is the amount "sufficient to deter, penalize, or punish the defendant in light of the circumstances of the case." O.C.G.A. § 51-12-5.1(d)(2). Relevant to this measure of damages is the *defendant's* "financial circumstances." *Holman v. Burgess,* 404 S.E.2d 144, 146 (Ga. App. 1991) (citation omitted). In this appeal, Autoliv Japan does not challenge the *admission* of evidence of Autoliv, Inc.'s financial circumstances to the extent that such evidence might bear upon Autoliv

---

[45] Autoliv, Inc. is far wealthier than its subsidiary, Autoliv Japan. (*Compare* Doc. 534 at 90 & n.74 *with* Docs. 485-5 and 526.)

Japan's own financial circumstances. The district court, however, did not just *admit* evidence of Autoliv, Inc.'s financial circumstances and rely on that evidence to discern the financial circumstances of Autoliv Japan. Instead, and more problematic, it awarded $100 million in punitive damages against the subsidiary based explicitly on the financial circumstances of the parent, not the subsidiary, concluding that it "need not distinguish between Autoliv entities." (Doc. 534 at 93.) This was error. Under Georgia law, separate corporations are distinct persons in the contemplation of the law, *see Shelby Ins. Co. v. Ford,* 454 S.E.2d 464, 465 (Ga. 1995), and as this Court has explained, "courts must exercise great caution, and must not disregard the corporate entity without a showing that the corporate form has been abused." *United States v. Fid. Cap. Corp.*, 920 F.2d 827, 837 (11th Cir. 1991) (interpreting Georgia law).

No such showing was made in this case. The district court disregarded the corporate form based on findings that an Autoliv, Inc. corporate logo appeared on certain Autoliv Japan documents, that Autoliv, Inc. claims to be the "world's largest automotive safety supplier" (by including its subsidiaries), that Autoliv, Inc. claims that its products have saved more than 30,000 lives "without any effort to separate the

lives saved by subsidiary," and that an employee of another Autoliv subsidiary appeared in this case as the testifying representative of Autoliv Japan. (Doc. 534 at 91-94.) None of these findings warrants a disregard of the corporate form under Georgia law. Indeed:

> The mere fact that a person owns and controls a corporation will not justify a finding of abuse of the corporate entity, even though that person may have used the corporation to promote his own ends. Similarly, that two corporations have been incorporated by the same party and have the same officers does not mean that the two corporations are interchangeable. More evidence of abuse, such as evidence that the controlling person commingled the corporation's assets with his own or those of other corporations he controlled, or that he failed to maintain corporate records separately, is *essential*.

*Fid. Cap. Corp.*, 920 F.2d at 837 (cleaned up) (emphasis added). And here, Ms. Andrews failed to present sufficient evidence establishing such abuse of the corporate form. Accordingly, the district court erred when it disregarded the corporate form and awarded $100 million in punitive damages against Autoliv Japan based on the financial circumstances of its parent company.

**D.    Conclusion**

For the foregoing reasons, the amended judgment issued by the district court should be reversed in part, and the award of punitive damages should be set aside altogether or reduced.

Respectfully submitted, this 18th day of January, 2023.

|  |  |
|---|---|
| | /s/ William J. Repko III |
| ALSTON & BIRD LLP | Doug Scribner |
| 1201 West Peachtree Street | Georgia Bar No. 632755 |
| Atlanta, GA 30309-3424 | Keith R. Blackwell |
| (404) 881-7000 (telephone) | Georgia Bar No. 024493 |
| (404) 881-7777 (facsimile) | Jenny A. Hergenrother |
| | Georgia Bar No. 447183 |
| | William J. Repko III |
| | Georgia Bar No. 301797 |
| | |
| | *Attorneys for Appellant* |

60

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,941 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

This 18th day of January, 2023.

|  | /s/ William J. Repko III |
|---|---|
| ALSTON & BIRD LLP | Doug Scribner |
| 1201 West Peachtree Street | Georgia Bar No. 632755 |
| Atlanta, GA 30309-3424 | Keith R. Blackwell |
| (404) 881-7000 (telephone) | Georgia Bar No. 024493 |
| (404) 881-7777 (facsimile) | Jenny A. Hergenrother |
|  | Georgia Bar No. 447183 |
|  | William J. Repko III |
|  | Georgia Bar No. 301797 |

*Attorneys for Appellant*

1

**CERTIFICATE OF SERVICE**

I hereby certify that on January 18, 2023, I filed an electronic copy of the foregoing Initial Brief of Appellant with the United States Court of Appeals for the Eleventh Circuit via CM/ECF and that a copy of this filing and notice of electronic filing was sent by CM/ECF to:

James E. Butler, Jr.
BUTLER PRATHER LLP
2719 Buford Highway
Atlanta, Georgia 30324

Tedra Cannella
Rory Weeks
CANNELLA SNYDER LLC
Post Office Box 1399
Decatur, Georgia 30031

William L. Ballard
Gregory R. Feagle
BALLARD & FEAGLE, LLP
4200 Northside Parkway NW
Atlanta, Georgia 30327

/s/ William J. Repko III
William J. Repko III
Georgia Bar No. 301797