No. 22-13713-D

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

AUTOLIV JAPAN, LTD.,
*Defendant-Appellant / Cross-Appellee,*

v.

JAMIE LEE ANDREWS, as surviving spouse of
Micah Lee Andrews, and JAMIE LEE ANDREWS,
as administrator of the Estate of Micah Lee Andrews,
*Plaintiffs-Appellees / Cross-Appellants.*

\*\*\*
State of Georgia,
*Intervenor.*

---

Appeal from the United States District Court
for the Northern District of Georgia

---

**RESPONSE AND REPLY BRIEF
OF APPELLANT / CROSS-APPELLEE**

---

Doug Scribner                    ALSTON & BIRD LLP
Keith R. Blackwell               One Atlantic Center
Jenny A. Hergenrother            1201 West Peachtree Street
William J. Repko III             Atlanta, Georgia 30309
                                 (404) 881-7000

*Counsel for Defendant-Appellant / Cross-Appellee*

*Autoliv Japan, Ltd. v. Andrews et al.*
*No. 22-13713-D*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-1 *et seq.,* Autoliv Japan, Ltd. certifies that the following judges, attorneys, other persons, associations of persons, firms, partnerships, and corporations have an interest in the outcome of this case:

1.  Alston & Bird LLP, *counsel for appellant;*

2.  Anand, Hon. Justin S., *United States Magistrate Judge;*

3.  Andrews, Jamie Lee, *appellee;*

4.  Autoliv, Inc. (NYSE: ALV), *affiliate of appellant;*

5.  Autoliv Japan, Ltd., *appellant;*

6.  Ballard, William L., *counsel for appellee;*

7.  Ballard & Feagle, LLP, *counsel for appellee;*

8.  Blackwell, Keith R., *counsel for appellant;*

9.  Bondurant, Mixson & Elmore, LLP, *counsel for appellee;*

10. Butler, James E. Jr., *counsel for appellee;*

11. Butler Prather LLP, *counsel for appellee;*

12. Cannella Snyder LLC, *counsel for appellee;*

13. Canella, Tedra L., *counsel for appellee;*

14. Carr, Christopher L., *counsel for intervenor;*

15. Chaplain, Brooke H., *counsel for intervenor;*

*Autoliv Japan, Ltd. v. Andrews et al.*
*No. 22-13713-D*

16. Dearing, Andrew F., *counsel for intervenor;*

17. The Estate of Micah Lee Andrews, by and through Jamie Lee Andrews as administrator, *appellee;*

18. Feagle, Gregory R., *counsel for appellee;*

19. Hergenrother, Jenny A., *counsel for appellant;*

20. Jones, Hon. Steve C., *United States District Judge;*

21. Lowrey, Frank M., *counsel for appellee;*

22. Office of the Georgia Attorney General, *counsel for intervenor;*

23. Patterson, Amy L., *counsel for intervenor;*

24. Repko, William J. III, *counsel for appellant;*

25. Scribner, Doug, *counsel for appellant;*

26. The State of Georgia, *nonparty holder of interest in portion of the judgment below;* and

27. Terry, Michael B., *counsel for appellee;*

28. Weeks, Rory A., *counsel for appellee;* and

29. Winkles, Logan B., *counsel for intervenor.*

Appellant Autoliv Japan, Ltd. further certifies that it is a wholly-owned subsidiary of Autoliv, Inc, a publicly traded company (NYSE: ALV).

## STATEMENT REGARDING ORAL ARGUMENT
## FOR CROSS-APPEAL

The parties agree that oral argument would aid the decisional process for the appeal brought by Autoliv Japan, Ltd.  In the event that the Supreme Court of Georgia does not definitively resolve the questions presented in the cross-appeal about the applicability of the apportionment statute, former O.C.G.A. § 51-12-33, when it issues its forthcoming decision in *Georgia CVS Pharmacy, LLC v. Carmichael,* Case No. S22G0527 (due to be decided on or before June 30, 2023), Autoliv Japan also agrees with Ms. Andrews that oral argument would aid the decisional process for her cross-appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................ i

TABLE OF CONTENTS .......................................................... ii

TABLE OF CITATIONS ........................................................ iv

I.    INTRODUCTION ............................................................ 1

II.   ARGUMENT AND CITATION OF AUTHORITY .......................... 4

    A.   The $100 million award of punitive damages in this
       case is excessive and not authorized by Georgia law. ............ 4
       1.   The evidence presented at trial does not clearly
          and convincingly establish a sufficient basis
          under Georgia law for any award of punitive
          damages, much less an award of $100 million. ............. 4
       2.   The award of $100 million in punitive damages is
          unconstitutionally excessive under Georgia law
          and bears no rational relationship to the wrong. ........ 13

    B.   A $100 million award of punitive damages in this case
       is grossly excessive and amounts to a denial of due
       process. ................................................................. 16
       1.   Reprehensibility .......................................... 16
       2.   Ratio ....................................................... 18
          a.   The Relevant Amount of Compensatory
             Damages ........................................... 18
          b.   The Ratio .......................................... 28
       3.   Other Civil Penalties Authorized by Law .................. 33

    C.   In awarding punitive damages, the district court
       improperly relied on the financial circumstances of
       Autoliv Japan's parent corporation. ..................................... 34

D.    The district court did not err in reducing the judgment based on apportionment of fault to Mazda. .......................... 36

    1.    The district court correctly held that Ms. Andrews forfeited her objection to an apportionment of fault to Mazda. ............................... 37

    2.    The district court also correctly found persuasive evidence that the Georgia Supreme Court would not adhere to Carmichael's interpretation of former O.C.G.A. § 51-12-33(b). .................................... 42

        a.    The Georgia Supreme Court may soon resolve this question about the meaning of former O.C.G.A. § 51-12-33(b). .......................... 43

        b.    The plain language of former O.C.G.A. § 51-12-33(b)—and settled principles of statutory interpretation in Georgia—indicate that the Georgia Supreme Court would not follow the Court of Appeals' interpretation of that provision. ............................................................. 46

E.    Conclusion ........................................................................... 54

# TABLE OF CITATIONS

**Page(s)**

CASES

*Action Marine, Inc. v. Cont'l Carbon, Inc.*,
  481 F.3d 1302 (11th Cir. 2007) ........................................................ 22

*Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*,
  312 Ga. 350, 862 S.E.2d 295 (2021) ....................................... 47, 48, 51

*Andrews v. Autoliv Japan, Ltd.*,
  715 F. App'x 965 (11th Cir. 2018) ....................................................... 8

*Audiotext Commc'ns Network v. US Telecom*,
  No. 94-2395-GT, 1996 WL 568839 (D. Kan. Sep. 4, 1996) ................. 22

*Bibbs v. Toyota Motor Co.*,
  304 Ga. 68, 815 S.E.2d 850 (2018) .................................................... 19

*Blount v. Stroud*,
  395 Ill. App. 3d 8, 915 N.E.2d 925 (2009) ........................................ 27

*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996) ................................................................ passim

*Boerner v. Brown & Williamson Tobacco Co.*,
  394 F.3d 594 (8th Cir. 2005) ....................................................... 18, 33

*Bravo v. United States*,
  577 F.3d 1324 (11th Cir. 2009) ......................................................... 43

*Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting
  Co.*,
  676 F.2d 516 (11th Cir. 1982) ........................................................... 42

*Caban-Wheeler v. Elsea*,
  71 F.3d 837 (11th Cir. 1996) ............................................................. 41

*Carter v. Allen*,
  940 F.3d 1233 (11th Cir. 2019) ......................................................... 50

*Cheeley v. Henderson,*
    261 Ga. 498, 405 S.E.2d 865 (1991)..................................................... 44

*CL SNF, LLC v. Fountain,*
    355 Ga. App. 176, 843 S.E.2d 605 (2020) ........................................... 50

*Clark v. Chrysler Corp.,*
    436 F.3d 594 (6th Cir. 2006)....................................................... 26, 33

*Collins v. Athens Orthopedic Clinic,*
    307 Ga. 555, 837 S.E.2d 310 (2019)..................................................... 45

*Colonial Pipeline Co. v. Brown,*
    258 Ga. 115, 365 S.E.2d 827 (1988)........................................... passim

*Craig v. Holsey,*
    264 Ga. App. 344, 590 S.E.2d 742 (2003) ........................................... 24

*Crown Series, LLC v. Holiday Hospitality Franchising, LLC,*
    357 Ga. App. 523, 851 S.E.2d 150 (2020) ........................................... 28

*CSX Transp., Inc. v. General Mills, Inc.,*
    846 F.3d 1333 (11th Cir. 2017)........................................................... 28

*Deal v. Coleman,*
    294 Ga. 170, 751 S.E.2d 337 (2013)..................................................... 48

*Dekalb Cnty. Bd. of Tax Assessors v. Barrett,*
    361 Ga. App. 598, 865 S.E.2d 192 (2021) ........................................... 53

*Democratic Party of Ga. v. Perdue,*
    288 Ga. 720, 707 S.E.2d 67 (2011)..................................................... 14

*Dep't of Transp. v. Blair,*
    220 Ga. App. 342, 469 S.E.2d 446 (1996) ........................................... 53

*Dist. Union Local 227 v. Fleischaker,*
    384 S.W.2d 68 (Ky. 1964)................................................................... 24

*Douglas Asphalt Co. v. QORE, Inc.,*
    657 F.3d 1146 (11th Cir. 2011)........................................................... 43

*Dubey v. Pub. Storage, Inc.*,
918 N.E.2d 265 (Ill. App. Ct. 2009) .................................................... 22

*Engle v. Finch*,
165 Ga. 131, 139 S.E. 868 (1927) ........................................................ 20

*F.E.B. Corp v. United States*,
818 F.3d 681 (11th Cir. 2016) ............................................................. 32

*Fastenal Co. v. Crawford*,
609 F. Supp. 2d 650 (E.D. Ky. 2009) .................................................. 23

*Gatto v. City of Statesboro*,
312 Ga. 164, 860 S.E.2d 713 (2021) .................................................... 45

*General Motors Corp. v. Moseley*,
213 Ga. App. 875, 447 S.E.2d 302 (1994) ..................................... 15, 21

*Georgia Clinic, P.C. v. Stout*,
323 Ga. App. 487, 747 S.E.2d 83 (2013) ............................................. 21

*Georgia CVS Pharmacy, Inc. v. Carmichael*,
362 Ga. App. 59, 865 S.E.2d 559 (2021) .................................... passim

*Goldenberg v. Murphy*,
108 U.S. 162 (1883) .............................................................................. 50

*Grabinski v. Blue Springs Ford Sales, Inc.*,
203 F.3d 1024 (8th Cir. 2000) ............................................................. 26

*Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church*,
420 F.3d 1317 (11th Cir. 2005) ............................................................ 42

*Hernandez v. Crown Equip. Co.*,
92 F. Supp. 3d 1325 (M.D. Ga. 2015) ................................................. 12

*Hospital Authority of Gwinnett County v. Jones*,
259 Ga. 759, 386 S.E.2d 120 (1989) .................................................... 14

*Hospital Authority of Gwinnett County v. Jones*,
261 Ga. 613, 409 S.E.2d 501 (1991) .................................................... 14

*In re Lansaw*,
    853 F.3d 657 (3d Cir. 2017) .............................................................. 27

*In re P.D.W.*,
    296 Ga. App. 189, 674 S.E.2d 338 (2009) .................................... 53, 54

*Ishimatsu v. Royal Crown Ins. Corp.*,
    2010 MP 8, ¶¶ 35-36, N. Mar. I. 424, 439 (2010) .............................. 22

*Johansen v. Combustion Eng'g, Inc.*,
    170 F.3d 1320 (11th Cir. 1999) ......................................................... 29

*Johns v. Suzuki Motor of Am., Inc.*,
    310 Ga. 159, 850 S.E.2d 59 (2020)..................................................... 39

*Jordan v. Bosworth*,
    123 Ga. 879, 51 S.E. 755 (1905)......................................................... 50

*Kemp v. AT&T*,
    393 F.3d 1354 (11th Cir. 2004) ......................................................... 28

*Kerrivan v. R.J. Reynolds Tobacco Company*,
    953 F.3d 1196 (11th Cir. 2020) ......................................................... 25

*Lathrop v. Deal*,
    301 Ga. 408, 801 S.E.2d 867 (2017)................................................... 49

*Lompe v. Sunridge Partners, LLC*,
    818 F.3d 1041 (10th Cir. 2016).................................................... 25, 33

*Molinos Valle del Cibao, C. por A. v. Lama*,
    633 F.3d 1330 (11th Cir. 2011).......................................................... 43

*Morro v. City of Birmingham*,
    117 F.3d 508 (11th Cir. 1997)..................................................... 41, 42

*Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1
    (1991)................................................................................................. 14

*Philip Morris USA v. Williams*,
    549 U.S. 346 (2007)................................................................... 17, 18

*Powell v. State,*
     270 Ga. 327, 510 S.E.2d 18 (1998)....................................................... 14

*Rockwell Int'l Corp. v. United States,*
     549 U.S. 457 (2007).............................................................................. 41

*Savannah Elec. Co. v. Bell,*
     124 Ga. 663, 53 S.E. 109 (1906).......................................................... 19

*Schriever v. Maddox,*
     259 Ga. App. 558 (2003)............................................................. passim

*SE Prop. Holdings, LLC v. Judkins,*
     822 F. App'x 929 (11th Cir. 2020)....................................................... 24

*Slone v. Quest Energy Corp.,*
     2022 WL 2402656 (E.D. Ky. May 4, 2022) ......................................... 23

*Soileau v. Smith True Value and Rental,*
     2012-1711, p. 9 (La. 6/28/13), 144 So. 3d 771 .................................... 50

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
     538 U.S. 408 (2003)................................................................ 29, 32, 33

*State v. Randle,*
     298 Ga. 375, 781 S.E.2d 781 (2016)..................................................... 49

*Stone Man v. Green,*
     263 Ga. 470, 435 S.E.2d 205 (Ga. 1993) ............................................... 5

*Turner v. Ga. River Network,*
     297 Ga. 306, 773 S.E.2d 706 (2015)..................................................... 45

*TXO Prod. Corp. v. Alliance Res. Corp.,*
     509 U.S. 443 (1993).............................................................................. 24

*U.S. EEOC v. W&O Inc.,*
     213 F.3d 600 (11th Cir. 2000).............................................................. 29

*United States v. Fid. Cap. Corp.,*
     920 F.2d 827 (11th Cir. 1991).............................................................. 35

*Vazquez v. Raymond Corp.*,
  2019 WL 176106 (N.D. Ga. Jan. 11, 2019) ......................................... 12

*W. & Atl. R. Co. v. Michael*,
  175 Ga. 1, 165 S.E. 37 (1932) ............................................................. 19

*Welch v. Gen. Motors Corp.*,
  949 F. Supp. 843 (N.D. Ga. 1996) ......................................................... 5

*Zaldivar v. Prickett*,
  297 Ga. 589, 774 S.E.2d 688 (2015) .................................................... 46

*Zhang v. Am. Gem Seafoods, Inc.*,
  339 F.3d 1020 (9th Cir. 2003) ............................................................. 21

*Zimmerman v. Direct Fed. Credit Union*,
  262 F.3d 70 (1st Cir. 2001) ................................................................. 22

## STATUTES

49 U.S.C. § 30165 ..................................................................................... 33

O.C.G.A. § 51-12-5 .................................................................................... 15

O.C.G.A. § 51-12-5.1 ...................................................................... 9, 15, 30

O.C.G.A. § 51-12-33 ......................................................................... passim

## OTHER AUTHORITIES

2022 Georgia Laws Act 876 (H.B. 961) .................................................. 36

Black's Law Dictionary (6th ed. 1990) ................................................... 50

Black's Law Dictionary (11th ed. 2019) ................................................. 49

Black's Law Dictionary 174 (5th ed. 1979) ........................................... 49

Ga. Const., art. VI, § IX, ¶ II ................................................................. 44

Merriam-Webster Online Dictionary (2020) .......................................... 50

Random House Unabridged Dictionary ................................................. 49

# I.    INTRODUCTION

The facts of this case do not justify a $100 million award of punitive damages. Any award of punitive damages under Georgia law requires clear and convincing evidence of willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. Here, the evidence shows—and Ms. Andrews does not really dispute—that a tradeoff between the avoidance of head injuries, on the one hand, and thoracic injuries, on the other, is inherent in every seatbelt design. The design of the 2005 Mazda 3 seatbelt effectively put a premium on the avoidance of thoracic injuries, which, Ms. Andrews says, shows a conscious indifference to head injuries. But the evidence is undisputed that, if accompanied by a properly functioning airbag, the seatbelt was sufficient to prevent the sort of head injury that Mr. Andrews sustained. To be sure, airbags sometimes do not function properly, but there is no evidence in this case—not one iota or scintilla—of the frequency with which airbags fail to deploy in crashes like the one that Mr. Andrews experienced, that is, crashes presenting a materially similar risk of serious head injury. And in the absence of that sort of evidence, it cannot

be said—much less with the confidence of clear and convincing proof—that the design balance struck by Mazda and Autoliv Japan was sufficiently wanton and consciously indifferent to serious head injuries to warrant an award of punitive damages. At best, the evidence shows only that the balance was struck unreasonably, which is a basis for strict liability, not punitive damages under Georgia law.

And in any event, the staggering $100 million award of punitive damages here is grossly excessive under *BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996), and its progeny. In an attempt to justify the size of the award, Ms. Andrews relies most prominently on the fact that her late husband lost his life. Autoliv Japan does not dispute that death is a serious harm that can justify a substantial punishment under *Gore.* But Georgia has chosen to punish tortfeasors for the particular harm of causing death by way of damages for wrongful death—which are, the Georgia Supreme Court has said, specifically intended to *punish*—not punitive damages. And this alternative punishment was imposed against Autoliv Japan in this case in the form of a $12.5 million award of wrongful-death damages. A $12.5 million penalty cannot be recharacterized as compensatory under *Gore* for the purpose of justifying

2

a second, even more substantial penalty. When the intended-to-punish damages for wrongful death are properly put aside in the *Gore* analysis, it becomes apparent that the $100 million award of *additional* punitive damages is disproportionate to the non-death harms for which those damages were imposed and is, therefore, grossly excessive under *Gore*. For these reasons, as well as the others set forth in Autoliv Japan's principal brief, the award of punitive damages cannot be sustained.

With respect to Ms. Andrews' cross-appeal, she contends that the district court misapplied former O.C.G.A. § 51-12-33 when it apportioned certain damages to Mazda and reduced the award against Autoliv Japan consistent with that apportionment. This contention is based entirely on one of several holdings in *Georgia CVS Pharmacy, Inc. v. Carmichael,* 362 Ga. App. 59, 865 S.E.2d 559 (2021), *cert. granted*, No. S22C0527, 2022 Ga. LEXIS 301 (Oct. 4, 2022), a decision that came down after the trial. *Carmichael* may or may not accurately predict how the Georgia Supreme Court would decide the same question—the touchstone for purposes of the *Erie* doctrine—and by the time this case is decided, we may know the answer, considering that the Supreme Court granted a writ of certiorari in *Carmichael*. But whether or not the Supreme Court

3

chooses to address the question—and even if it turns out that *Carmichael* is an accurate prediction of how the Georgia Supreme Court would decide the question—Ms. Andrews waited too late to object to apportionment, raising it only after the district court handed down its verdict. Indeed, the Court of Appeals in *Carmichael* simply followed its earlier decision in *Schriever v. Maddox,* 259 Ga. App. 558 (2003), a case issued long before the trial of this case. To the extent that Ms. Andrews now has a meritorious objection to apportionment under *Carmichael,* she long ago had the same meritorious objection under *Schriever,* and she could have—and should have—raised that objection before trial. She did not, and she thereby forfeited any objection to apportionment. Accordingly, this Court should affirm in the cross-appeal.

## II.    ARGUMENT AND CITATION OF AUTHORITY

### A.    The $100 million award of punitive damages in this case is excessive and not authorized by Georgia law.

#### 1.    *The evidence presented at trial does not clearly and convincingly establish a sufficient basis under Georgia law for any award of punitive damages, much less an award of $100 million.*

In its principal brief, Autoliv Japan explained that, under Georgia law, "punitive damages, the purpose of which is to punish, penalize or

deter, are, as a general rule, improper where a defendant has adhered to [applicable] safety regulations." *Stone Man v. Green*, 263 Ga. 470, 472, 435 S.E.2d 205, 206 (1993) (cleaned up). Autoliv Japan further explained that the Georgia Supreme Court has recognized that compliance with regulations "tend[s] to show that there is no clear and convincing evidence of . . . that entire want of care which would raise the presumption of conscious indifference to consequences." *Id.* (cleaned up). *See also Welch v. Gen. Motors Corp.*, 949 F. Supp. 843, 844-46 (N.D. Ga. 1996). And this is especially true in contexts—like this one—in which some risk of harm is unavoidable. *See Stone Man*, 263 Ga. at 472, 435 S.E.2d at 206. That said, Autoliv Japan also acknowledged that regulatory compliance alone does not absolutely foreclose punitive damages, and when other evidence strongly shows wanton or conscious indifference to consumer safety, punitive damages may still be authorized. (Appellant Br. at 33.) Autoliv Japan noted that Georgia courts have allowed punitive damages notwithstanding regulatory compliance in cases in which a manufacturer was motivated solely or principally by profit to implement a product design that endangered consumers, as well as cases in which a manufacturer knows of actual

incidents and injuries involving the use of its product, which lead to an actual awareness that the product is unreasonably unsafe. (*Id.* at 33-34.)

In her response brief, Ms. Andrews does not cite any evidence demonstrating that Autoliv Japan was motivated by profit to steer Mazda to a "less safe" seatbelt, nor does she cite any evidence of other incidents—similar to Mr. Andrews' crash—that would have led Autoliv Japan to conclude that the seatbelt was unreasonably dangerous. Indeed, there is no such evidence. Instead, Ms. Andrews points to four facts that may well show that the underlying design was defective but do not show—much less *clearly and convincingly* show—that Autoliv Japan acted with a wanton or conscious indifference to consumer safety.

First, Ms. Andrews points to the district court's finding that the 2005 Mazda 3 seatbelt was an "extreme outlier" and was "the worst in its class," as compared to the webbing payout in other vehicles in the same class. (Appellee Br. at 32; Doc. 534 at 79.) But there is no evidence that Mr. Andrews would have fared any better in his crash if the 2005 Mazda 3 had been equipped with any of these other seatbelts. (*See* Appellant Br. at 16.) For that reason, even accepting the finding that the seatbelts in the 2005 Mazda 3 and the other vehicles in its class were dramatically

different in terms of payout, there is no evidence that the Mazda 3 seatbelt was *materially more dangerous* for Mr. Andrews, much less that Autoliv Japan *knew* it was materially more dangerous for people like him. Consequently, characterizing the 2005 Mazda 3 seatbelt as an "extreme outlier" is no proof of a wanton or conscious indifference to consumer safety. This is particularly true when considering that seatbelt design inherently involves an engineering tradeoff between the risk and mitigation of head and thoracic injuries, and the 2005 Mazda 3 seatbelt reduced the force applied to drivers' chests more than any other seatbelt in its class. (Doc. 600 at 45:5-22, 69:12-70:10; Doc. 550 at 130:7-24; Doc. 601 at 39:5-7, 113:21-115:10; Doc. 620-6 (Pl. Trial Ex. 9) (Shoulder Belt Load).)

Second, Ms. Andrews emphasizes Autoliv Japan's knowledge that, if the airbag failed to deploy, the seatbelt would be essentially useless to the driver in a crash like the one Mr. Andrews experienced. (Appellee Br. at 32.) But there is no evidence—not one bit—of the frequency with which airbags fail to deploy in crash events presenting a materially similar risk

7

of serious head injury.[1] (*See* Appellant Br. at 35.)  Accordingly, there was no evidence at all of the actual magnitude of the risk that the seatbelt and airbag together would fail to protect an occupant from serious head injuries. In the absence of such evidence, the act of selling a seatbelt that reduced the risk of thoracic injuries, but might expose a driver in certain crash events to more serious head injuries *if* the airbag failed to deploy, is simply not indicative of a wanton or conscious indifference by Autoliv Japan.

Third, Ms. Andrews says that Autoliv Japan did nothing to "warn consumers, Mazda, or safety regulators of the known danger posed by its seatbelts." (Appellee Br. at 32.)  But this is a case in which the plaintiff did not even allege that the defendant was *negligent* in failing to warn. *See Andrews v. Autoliv Japan, Ltd.*, 715 F. App'x 965, 967 (11th Cir. 2018).  Thus, there was no finding that Autoliv Japan *tortiously* failed to warn anyone. That is significant because, in Georgia, the purpose of

---

[1] To be sure, Ms. Andrews' airbag expert testified that "he reviews 20 to 25 cases per year with serious injuries where the airbag failed to deploy correctly or at all." But her expert did not differentiate between deployment failures and "incorrect deployments," nor did he explain what an "incorrect deployment" is and whether it impacts seatbelt payout in the same way as a deployment failure.  (Appellee Br. at 14-15; Doc. 550 at 42:3-10.)

punitive damages is to deter "wrongful" acts, that is, *tortious* acts.[2] The significant weight[3] that the district court placed on the absence of a warning in its decision to award punitive damages was misplaced.[4]

Finally, Ms. Andrews argues that an award of punitive damages was appropriate because Autoliv Japan "ignored existing, safer designs and its duty to work with Mazda to remedy defects." (Appellee Br. at 33.) But that argument is misleading.[5] The evidence shows that Autoliv

---

[2] *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118, 365 S.E.2d 827, 830 (1988) ("In Georgia, when the *tortious conduct* amounts to wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care . . . [,] punitive damages are allowed pursuant to OCGA § 51–12–5 to deter the wrongdoer from repeating *his wrongful acts*.") (cleaned up) (emphasis added).

[3] Doc. 534 at 82-83 ("[T]here is evidence that shows willful misconduct and that entire want of care that would raise the presumption of conscious indifference to the consequences. . . . *Said evidence* is the fact Autoliv did not warn any foreseeable users/consumers of the product, such as Mr. Andrews, of the dangers of the product.") (emphasis added).

[4] In concluding that failure-to-warn evidence was relevant to Ms. Andrews' claim for punitive damages, the district court cited only the plain language of Georgia's punitive damages statute—O.C.G.A. § 51-12-5.1—which does not address failure-to-warn evidence. (Doc. 534 at 80 n.66; Doc. 492 at 3-4.)

[5] Ms. Andrews' emphasis of isolated, out-of-context testimony from an Autoliv Japan witness—"Mazda was not concerned, so we weren't concerned"—is also misleading. (Appellee Br. at 37.) As explained in Autoliv Japan's principal brief, when the witness said "Mazda was not concerned, so we weren't concerned," he was referring—as shown by the context of his statement—to a point in time after NCAP testing, on which

Japan did consider and propose to Mazda two other seatbelt options that would have had higher deployment thresholds and would have been, according to Ms. Andrews, "safer." (Doc. 534 at 42, 80; Doc. 620-140 (Pl. Trial Ex. 1163) at 97:14-19.) And Autoliv Japan did not, as Ms. Andrews suggests, ignore or refuse to work with Mazda. In fact, Ms. Andrews points to a January 2002 email that Mazda sent Autoliv Japan regarding computer-simulated testing, and the evidence shows that Autoliv Japan actually did respond to that email, indicating that the computer testing might be misplaced because it appeared that the testing involved a simulated crash at 56 mph, an unusually severe speed that is not

---

the 2005 Mazda 3 received four of five stars (the same score as twelve of the other vehicles in its class)—a point in time at which it would have been logical for Mazda not to have been concerned. (Appellant Br. at 18 n.19; Doc. 534 at 80; Doc. 620-6 (Pl. Trial Ex. 9).)

commonly tested.[6],[7]  (*See* Appellee Br. at 20-21, 33; Doc. 620-43 (Pl. Trial Ex. 128) at 2; Doc. 551 at 19:14-21:11; Doc. 601 at 115:18-20.)

Concluding her arguments about the propriety of punitive damages, Ms. Andrews accuses Autoliv Japan of "pick[ing] a useless fight with the district court's factual findings." (Appellee Br. at 36.) But that is a mischaracterization. Autoliv Japan takes issue not with the district court's *fact findings,* but rather with its *legal conclusion* that the evidence authorized an award of punitive damages, notwithstanding that the

---

[6] The January 2002 email indicates that the testing was run at "56." (Doc. 620-43 (Pl. Trial Ex. 128) at 2.)  Ms. Andrews *speculates in her response brief* that "56" refers to 56 kilometers per hour (km/h), which equals 35 miles per hour (mph). (Appellee Br. at 11 n.3.)  Meanwhile, the second page of the email thread itself indicates that Autoliv Japan interpreted the underlying data as indicating that the testing took place at 90 km/h, which is equal to 56 mph. (Doc. 620-43 (Pl. Trial Ex. 128) at 1-2; Doc. 551 at 18:10-21:11.)  And for purposes of the punitive damages inquiry here, it is only Autoliv Japan's knowledge of the speed that matters.

[7] In arguing that Autoliv Japan's proposed changes made the subject seatbelt less safe (*see* Appellee Br. at 33), Ms. Andrews relies on evidence that Autoliv Japan suggested that Mazda use a non-digressive load limiter, which "weakened" the seatbelt. (Doc. 534 at 30-31, 84.)  However, there was no evidence presented at trial indicating that Mr. Andrews' injuries would have been less severe had his seatbelt incorporated a digressive load limiter. So, even if this proposal "weakened" the seatbelt in some sense, there is no evidence that it "weakened" the seatbelt in any material way for Mr. Andrews.

11

evidence quite clearly established that seatbelt payout—and the design choices that drive payout—reflect an engineering tradeoff between the avoidance or mitigation of the respective risks of serious head injuries and serious thoracic injuries. The elimination of all such risks is not feasible, especially to the extent that an airbag—with which the load-limiting seatbelt is intended to function—fails to deploy.

Accordingly, as Autoliv Japan has noted previously, it is one thing for a court to say that a manufacturer like Autoliv Japan struck the balance between the potential harms unreasonably, exposing it to strict liability for defective design. It is quite another to say that striking the balance unreasonably—in a way that afforded greater protection to consumers from thoracic injuries, albeit by exposing consumers to an increased risk of head injuries—reflects a wanton or conscious indifference to consumer safety. *Cf. Vazquez v. Raymond Corp.*, No. 2:17-CV-20-RWS, 2019 WL 176106, at *7 (N.D. Ga. Jan. 11, 2019) (testimony by "engineers who disagree with Defendant's choice in trading one danger for another is not enough [to establish a punitive damages claim]" where the forklift at issue was "designed in compliance with all applicable standards and regulations"). *See also Hernandez v. Crown*

12

*Equip. Co.,* 92 F. Supp. 3d 1325, 1357 (M.D. Ga. 2015) (even considering 741 prior accidents, where design decisions were driven by engineering considerations—weighing "the benefits of a particular design against the possibility that other risks might be increased"—Georgia law did not permit punitive damages).[8] That is *especially* true when the magnitude of the increased risk of serious head injuries is unknown and unknowable from the evidence presented at trial because there was *no evidence* of the frequency with which airbags fail in crash events materially like the one in this case. The district erred when it awarded any punitive damages against Autoliv Japan.

### 2. *The award of $100 million in punitive damages is unconstitutionally excessive under Georgia law and bears no rational relationship to the wrong.*

In its principal brief, Autoliv Japan—citing *Colonial Pipeline*—argued that the underlying punitive damages award does not survive scrutiny under Georgia's Excessive Fines Clause because it does not reflect "a rational relationship between the offense and the punishment." (Appellant Br. at 29-31.) In opposition to this argument, Ms. Andrews

---

[8] Tellingly, Ms. Andrews did not address either *Vazquez* or *Hernandez*—both of which were cited in Autoliv Japan's principal brief—in her response brief.

notes that *Colonial Pipeline* was only a plurality decision and is not binding authority. (Appellee Br. at 39.) While true, later majority decisions of the Georgia Supreme Court have cited the *Colonial Pipeline* plurality favorably for its constitutional interpretation. *See, e.g., Democratic Party of Ga. v. Perdue*, 288 Ga. 720, 728 n.12, 707 S.E.2d 67 (2011); *Powell v. State*, 270 Ga. 327, 331 n.3, 510 S.E.2d 18 (1998). These favorable citations suggest that the Supreme Court today *would* follow the *Colonial Pipeline* plurality.

Ms. Andrews also contends that *Colonial Pipeline*'s constitutional ruling is undercut by *Hospital Authority of Gwinnett County v. Jones*, 259 Ga. 759, 386 S.E.2d 120 (1989), but that decision was vacated by the U.S. Supreme Court and remanded for further consideration in light of *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1 (1991). *See* 499 U.S. 914 (1991). On remand, the Georgia Supreme Court in *Jones* acknowledged *Colonial Pipeline*'s proportionality standard, explaining that a comparison of punitive damages to actual damages awarded might be appropriate in some cases, but not in a case where potential harm was great, but actual injury was "slight." *See* 261 Ga. 613, 615, 409 S.E.2d

14

501, 503 (1991).  This case, of course, is not one in which the actual injury was "slight."

Finally, Ms. Andrews argues that the proportionality limitation in *Colonial Pipeline* should not apply here because the Georgia Court of Appeals in *Moseley* "did not believe" that the $101 million punitive damages award in that case violated the Excessive Fines Clause.  (*See* Appellee Br. at 41.)  This argument, however, is unconvincing because, unlike here, there is no indication that the defendant in *Moseley* challenged the punitive damages award on the grounds that it violated the Excessive Fines Clause, nor does *Moseley* even mention of *Colonial Pipeline*.  *See* 213 Ga. App. at 885-86, 447 S.E.2d at 312.[9]

---

[9] Moreover, while Ms. Andrews—in connection with her discussion of *Moseley*—curiously attempts to distinguish *Colonial Pipeline* (a non-products liability case) on the grounds that it "applied the old version of Georgia's punitive damages statute, before such damages were capped and an exception allowing unlimited punitive damages adopted," that distinction is truly of no moment because, under the old version (which *Colonial Pipeline* applied), punitive damages were uncapped in all tort actions.  (Appellee Br. at 41.)  *See Colonial Pipeline*, 258 Ga. at 122, 365 S.E.2d at 832 (citing O.C.G.A. § 51-12-5 as the relevant punitive damages statute); *compare* O.C.G.A. § 51-12-5 *with* O.C.G.A. § 51-12-5.1.  In other words, *Colonial Pipeline* is not distinguishable on the grounds that the relevant statute in that case treats punitive damages in products liability cases differently than the current statute does.

15

In sum, Ms. Andrews' arguments in opposition to this Court's application of the Excessive Fines Clause are unpersuasive, and the punitive damages award at issue cannot survive scrutiny under that constitutional provision.

**B.     A $100 million award of punitive damages in this case is grossly excessive and amounts to a denial of due process.**

The three constitutional guideposts identified by the U.S. Supreme Court in *Gore* and its progeny demonstrate that the punitive damages award in this case is grossly excessive.

### 1.     *Reprehensibility*

While Autoliv Japan argued that only one of the five reprehensibility factors articulated in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 562 (1996)—physical harm—is present here, Ms. Andrews argues that two others are implicated. (Appellee Br. at 42.) First, Ms. Andrews argues that this case involves indifference to safety, but the Court should reject that contention for the reasons explained in the preceding section of this reply brief, as well as Autoliv Japan's principal brief. (*Id.*) Second, Ms. Andrews argues that this case involves repeated misconduct. (*Id.*) In doing so, however, Ms. Andrews fails to acknowledge that the repeated-misconduct factor requires "evidence that

a defendant has repeatedly engaged in prohibited conduct while *knowing or suspecting* that it was unlawful [that] would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *BMW*, 517 U.S. at 576-77 (emphasis added). Here, there is no evidence that Autoliv Japan at any relevant time knew or suspected the seatbelt in the 2005 Mazda 3 was unreasonably dangerous.[10]

As further support for her invocation of the repeated-misconduct factor, Ms. Andrews cites *Philip Morris USA v. Williams*, 549 U.S. 346 (2007), for the proposition that "selling dangerous products to numerous consumers is *particularly* reprehensible because of the risk of harm to many." (Appellee Br. at 42 (emphasis added).) But that is not exactly

---

[10] As noted in its principal brief, Autoliv Japan knew the seatbelt would spool out substantially in the event of an airbag failure (Doc. 534 at 79), but again, there is no evidence of the frequency with which airbags fail to deploy in general, much less in crashes materially similar to this one. (Appellant Br. at 46.) There is also no evidence of prior incidents similar to this one. Moreover, the seatbelt at issue not only met federal regulatory requirements, but seatbelts with the same deployment threshold previously had been used by other carmakers. (Doc. 534 at 81; Doc. 620-140 (Pl. Trial Ex. 1163) at 96:20-97:4.) For these reasons, Autoliv Japan's awareness of some level of risk—the magnitude of which is unknown in this case—is not evidence that it knew the design was *unreasonably* dangerous.

what *Philip Morris* says. *Phillip Morris* says that "conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few." 549 U.S. at 357. The distinction is important because reprehensibility is a question of degree, and while conduct that risks harm to many may be more reprehensible than conduct that risks harm to only a few, *Philip Morris* does *not* say that "conduct that risks harm to many" is necessarily among the most reprehensible of *all* conduct (such that it justifies the extreme punitive damages award of $100 million or the extreme 100:1 ratio of compensatory damages to punitive damages here[11]), as Ms. Andrews suggests. (Appellee Br. at 42.)

### 2. *Ratio*

#### a. *The Relevant Amount of Compensatory Damages*

<u>Wrongful-death damages</u>. For purposes of assessing the ratio of compensatory to punitive damages, the wrongful-death damages

---

[11] Indeed, Autoliv Japan's conduct pales in comparison to the historical practices of many tobacco companies. *See, e.g.*, *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 603 (8th Cir. 2005) (holding, in a wrongful death case alleging defective design of cigarettes in which the jury awarded $4 million in compensatory damages, that 1:1 ratio of punitive damages to compensatory damages was constitutionally appropriate, notwithstanding evidence of a high degree of reprehensibility, including tobacco manufacturer's efforts to mislead consumers about health risks associated with smoking).

awarded by the district court should not be counted as compensatory damages. Most fundamentally, wrongful-death damages ought to be excluded because Georgia law awards these damages for the purpose of punishing one who wrongfully brings about the death of another and specifically disallows additional punitive damages for causing death. Indeed, the Georgia Supreme Court has explained that wrongful-death damages in Georgia are "primarily to *punish* the defendant for its negligence in bringing about the death of a human being," *Savannah Elec. Co. v. Bell,* 124 Ga. 663, 53 S.E. 109, 112 (1906) (emphasis added), and wrongful-death damages are intended to "mak[e] homicide expensive." *W. & Atl. R. Co. v. Michael,* 175 Ga. 1, 165 S.E. 37, 42 (1932). *See also Bibbs v. Toyota Motor Co.,* 304 Ga. 68, 80, 815 S.E.2d 850, 859 (2018). Because wrongful-death damages are themselves punitive in nature,[12] Georgia does not permit an additional award of punitive

---

[12] The Georgia Supreme Court has acknowledged that wrongful-death damages in some cases may incidentally serve a compensatory purpose, but compensation for harm "is not the primary object of the [wrongful-death] statute." *Savannah Elec. Co.,* 53 S.E. at 112. Rather, the principal purpose and function of wrongful-death damages in Georgia is punishment. *See id.*

damages for wrongful death, which would amount to an impermissible "double penalty." *Engle v. Finch,* 165 Ga. 131, 139 S.E. 868, 869 (1927).

In this case, the district court imposed this separate and distinct punishment upon Autoliv Japan for the death of Mr. Andrews by its award of $12.5 million in wrongful-death damages. Even if additional punitive damages were authorized in this case to punish Autoliv Japan for designing a defective seatbelt that caused Mr. Andrews to sustain a serious injury and endure pain and suffering, Autoliv Japan cannot—as a matter of Georgia law—be punished civilly again and more for causing his death. Treating the wrongful-death damages as compensatory in the constitutional ratio—for the purpose of justifying a substantially larger award of additional punitive damages, which properly can be awarded in Georgia only for harms other than death—effectively amounts to the indirect accomplishment of something that Georgia law forbids to be done directly: the imposition of a "double penalty." *See Engle,* 139 S.E. at 869. This Court looks to state law to determine whether particular components of damages awards should be treated as "compensatory" for purposes of the constitutional ratio, *see Action Marine, Inc. v. Cont'l Carbon, Inc.,* 481 F.3d 1302, 1321 (11th Cir. 2007), and under long-settled

principles of Georgia law, wrongful-death damages simply are not compensatory.[13] Treating wrongful-death damages as compensatory here would both overstate the compensatory damages and understate the punitive damages.

The exclusion of wrongful-death damages in the assessment of the ratio is compelled most fundamentally by the unique nature of wrongful-death damages in Georgia law. But excluding them would be consistent with the approach of other courts that have excluded compensatory damages awarded on causes of action for which no punitive damages are authorized. *See, e.g., Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020,

---

[13] In response to the Georgia Supreme Court's characterization of wrongful death damages as punitive, Ms. Andrews cites *Georgia Clinic, P.C. v. Stout*, 323 Ga. App. 487, 494, 747 S.E.2d 83, 91 (2013), where the Georgia Court of Appeals said that the jury had awarded "$500,000 in compensatory damages to the plaintiffs for the 'wrongful death' claim." But *Georgia Clinic* did not involve a constitutional challenge to the punitive damages award, *see* 323 Ga. App. at 493, 747 S.E.2d at 90, and in any event, the Georgia Court of Appeals cannot rewrite the decisional law of the Supreme Court. That said, if this Court were nevertheless inclined to attribute any persuasive value to passing characterizations of wrongful-death awards by the Georgia Court of Appeals, it should consider *General Motors Corp. v. Moseley*, 213 Ga. App. 875, 885, 447 S.E.2d 302, 312 (1994), a case that Ms. Andrews cites repeatedly, and in which the Georgia Court of Appeals described the ratio of punitive to compensatory damages in that case as $101 million to $1 (one dollar), which excludes the wrongful-death damages that were awarded in that case.

1044 (9th Cir. 2003) (calculating ratio using only compensatory damages awarded on claim for which punitive damages were awarded and without damages awarded under statute authorizing double damages); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 n.9 (1st Cir. 2001) ("We believe that it is appropriate to construct the ratio by looking only to the count on which punitive damages were awarded . . . ."); *Ishimatsu v. Royal Crown Ins. Corp.*, 2010 MP 8, ¶¶ 35-36, N. Mar. I. 424, 439 (2010) (eliminating compensatory damages awarded on claims for which punitive damages were not available in calculation of ratio); *Dubey v. Pub. Storage, Inc.*, 395 Ill. App. 3d 342, 360, 918 N.E.2d 265, 282 (2009) (separately calculating constitutional ratios for punitive and compensatory damages awarded on separate claims); *cf. Audiotext Commc'ns Network v. US Telecom*, No. 94-2395-GT, 1996 WL 568839, at *8 (D. Kan. Sep. 4, 1996) (under Florida statute presumptively limiting punitive damages to three times the amount of compensatory damages, "[i]t is implicit under the statute that the calculation of the appropriate amount of punitive damages should be limited to compensatory damages awarded on claims upon which the claimant is entitled to punitive damages").

Although Ms. Andrews points to a single case in which a district court counted compensatory damages awarded for civil conspiracy in assessing the constitutionality of punitive damages awarded on a related fraud claim, *see Fastenal Co. v. Crawford,* 609 F. Supp. 2d 650, 660-61 (E.D. Ky. 2009), the greater weight of authority suggests that such compensatory damages should be excluded. In any event, compensatory damages are intended in the constitutional ratio to reflect the magnitude of the relevant *harm* for which punitive damages are awarded, *see BMW*, 517 U.S. at 580-82*,* and in *Fastenal,* even if compensatory damages awarded on one cause of action were counted to justify punitive damages awarded on another, both causes of action involved essentially the same *harm,* and it appears that punitive damages *could* have been awarded under both. *See Fastenal,* 609 F. Supp. 2d at 660-61. *See also Dist. Union Local 227 v. Fleischaker*, 384 S.W.2d 68, 70, 73 (Ky. 1964) (upholding punitive damage award for civil conspiracy claim); *Slone v. Quest Energy Corp.*, No. 7:21-CV-00101, 2022 WL 2402656, at *6 (E.D. Ky. May 4, 2022) (indicating that a civil conspiracy claim is an avenue to obtain a punitive damages award under Kentucky law). Here, on the other hand,

death is a separate and distinct harm, and one for which additional punitive damages *cannot* be awarded as a matter of Georgia law.

<u>Hypothetical compensatory damages for "potential" harm</u>. Ms. Andrews argues that this Court should look not only to the actual compensatory damages awarded in this case for the actual injuries sustained by Mr. Andrews, but also to hypothetical damages that could have been awarded for "potential" harm. (*See* Appellee Br. at 43-45, 48.) But the U.S. Supreme Court and this Court have only considered "potential" harm in connection with the ratio when the conduct at issue threatened great injury but (fortuitously) resulted in only negligible or minor harm.[14] That simply is not the case here; the seven-figure award of general damages does not suggest a negligible or minor harm.[15]

---

[14] *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 462 (1993) (considering potential harm when the petitioner's conduct only resulted in $19,000 in actual damages); *SE Prop. Holdings, LLC v. Judkins*, 822 F. App'x 929, 936-37 (11th Cir. 2020) (considering potential harm when no compensatory damages were awarded); *see also Craig v. Holsey*, 264 Ga. App. 344, 349, 590 S.E.2d 742, 748 (2003) (considering potential harm when the appellant's conduct only resulted in $8,000 in actual damages).

[15] Potential harm is also irrelevant because Mr. Andrews died in the accident and was not "threatened with [] additional potential harm." *See BMW*, 517 U.S. at 582.

Damages apportioned to Mazda. For ratio purposes, the relevant compensatory damages are the amount of special and general damages awarded to the estate and against Autoliv Japan—roughly $1 million. Despite the arguments raised by Ms. Andrews (and the State) to the contrary, the relevant compensatory damages should not include the amount of special and general damages that were apportioned to Mazda. Although Ms. Andrews suggests that the Court decided this issue in *Kerrivan v. R.J. Reynolds Tobacco Company*, 953 F.3d 1196 (11th Cir. 2020), it did not. *See id.* at 1210 (acknowledging argument that compensatory damages apportioned to others should not be considered in constitutional ratio, but declining to decide that question because "the punitive damages award would still not be unreasonable" in any event). Meanwhile, other circuit courts have in fact addressed this issue, and they have concluded that only a defendant's individual portion of the compensatory damages should be considered in the ratio for that defendant. *See Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1068 (10th Cir. 2016) (for constitutional ratio purposes in a case in which compensatory damages are apportioned, the proper comparison is the proportion of punitive damages to a "[d]efendant's individual portion of

the total compensatory damages"); *Clark v. Chrysler Corp.*, 436 F.3d 594, 606 n.16 (6th Cir. 2006) ("[A] ratio based on the full compensatory award would improperly punish [the defendant] for conduct that the jury determined to be the fault of the plaintiff."); *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir. 2000) (rejecting the plaintiff's argument that the "entire actual damages award" should be considered for the ratio for each defendant). This Court should follow suit.

Prejudgment interest and attorneys' fees. The Court should reject Ms. Andrews' argument that the amount of compensatory damages for purposes of the ratio should include prejudgment interest and attorneys' fees. As an initial matter, Ms. Andrews waived these arguments because she did not raise them before the district court and give that court the "opportunity to recognize and rule on" those arguments. (*See generally* Doc. 554.) *CSX Transp., Inc. v. General Mills, Inc.*, 846 F.3d 1333, 1336-37 (11th Cir. 2017) ("A federal appellate court will not, as a general rule, consider an issue that is raised for the first time on appeal.") (cleaned up).

26

Moreover, with respect to the prejudgment interest that the district court awarded, prejudgment interest under Georgia law is not properly treated as compensatory for purposes of the constitutional ratio in any event. As the Georgia courts have explained, "[t]he purpose of prejudgment interest is to compensate the injured party for the delay in receiving money damages," and as a result, "prejudgment interest occupies a category separate from compensatory damages." *See Crown Series, LLC v. Holiday Hospitality Franchising, LLC*, 357 Ga. App. 523, 531-32, 851 S.E.2d 150, 157 (2020). Prejudgment interest in Georgia simply does not reflect the gravity of the harm justifying the imposition of punitive damages, and prejudgment interest should not be counted as compensatory in the assessment of the constitutional ratio.

As to attorneys' fees, there has been no finding in this case—unlike the cases cited by Ms. Andrews—that she is entitled to any compensatory damages in the form of attorneys' fees for any harm she sustained. *See In re Lansaw*, 853 F.3d 657, 663, 671 (3d Cir. 2017) (including attorneys' fees in actual damages portion of ratio where there had been an award of attorney fees entered by the court); *Blount v. Stroud*, 395 Ill. App. 3d 8, 18, 29, 915 N.E.2d 925, 936, 945 (2009) (same). Nor has there been any

27

factual finding by the district court that Ms. Andrews has incurred a specific amount of fees to "vindicate rights violated by conduct justifying punitive damages." (*See* Appellee Br. at 54.)  In the absence of an actual award of attorneys' fees, no amount of attorneys' fees should be counted as compensatory damages for purposes of the constitutional ratio.

      *b.*    *The Ratio*

When counting only the damages actually awarded to the estate and against Autoliv Japan, the ratio of punitive damages to compensatory damages is approximately 100:1.[16] And even if the damages awarded to the estate and apportioned to Mazda were included, the ratio still would be nearly 50:1.[17]  These ratios are far in excess of what will satisfy due process, and neither Ms. Andrews nor the State point to any authority that would uphold awards involving these ratios.[18]

---

[16] $100,000,000.00 : $1,009,671.70.

[17] $100,000,000.00 : $2,019,343.40.

[18] Indeed, a survey of the reported decisions since *BMW* indicates that this Court has approved punitive damages awards with a ratio exceeding a single-digit multiplier in only three cases, all involving very different circumstances than those presented here, and all involving substantially smaller awards. *See, e.g., Kemp v. AT&T*, 393 F.3d 1354, 1365 (11th Cir. 2004) (finding $1 million punitive award excessive in a state racketeering case with $115 award of compensatory damages, but concluding that $250,000 in punitive damages would pass constitutional muster because

*See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."); *see also Williams*, 947 F.3d at 755 (holding that a 13:1 ratio "raise[d] a red flag that the punitive damage amount likely violates the due process clause"). They argue instead that the U.S. Supreme Court's guideposts marking the outermost constitutional limits of punitive damages awards do not apply here,[19] principally because Georgia law

---

anything less "would not serve as a meaningful deterrent to a corporation like AT&T"); *U.S. EEOC v. W&O Inc.*, 213 F.3d 600, 616-17 (11th Cir. 2000) (affirming $100,000 punitive awards for employees with compensatory damages of only $3,800 and $6,225 in employment discrimination case, noting that "the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify ratios higher than might otherwise be acceptable"); *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1339-40 (11th Cir. 1999) (affirming $4.35 million punitive award in environmental pollution case in which total actual damages of several property owners was only $47,000).

[19] Those constitutional guideposts are 9:1, 4:1, and 1:1. *See State Farm*, 538 U.S. at 425 ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree."); *BMW*, 517 U.S. at 581 (stating that a punitive damages award of "more than 4 times the amount of compensatory damages" might be "close to the line" of constitutional impropriety) (cleaned up); *State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."); *see also Williams*, 947 F.3d at 750 (interpreting Supreme Court cases and stating the following: "Moreover,

limits punitive damages awarded for a single product defect to a single award and divides that award between the plaintiff and the State.[20] (Appellee Br. at 56-60; Intervenor Br. at 13-21.) Although Georgia's "single award" limitation might arguably support a slightly higher ratio in some cases than would otherwise be constitutionally permissible, it does not mean that judges and juries can award any amount of punitive damages whatsoever consistent with due process, as Ms. Andrews and the State seem to suggest. To the contrary, any punitive damages award issued under Georgia law must still align with the Constitution and the constitutional guidance provided by the U.S. Supreme Court. A variety of statutory limitations on punitive damages awards—including those highlighted by the State (*see* Intervenor Br. at 19 n.2)—have long existed,

---

few awards exceeding a single-digit ratio (that is, anything greater than a 9:1 ratio) to a significant degree will satisfy due process. But the Court has emphasized that these are not hard and fast rules. Sometime even a 4:1 ratio may be too great. If, for example, the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee and a punitive damages award that exceeds that ratio will be suspect.").

[20] *See* O.C.G.A. § 51-12-5.1(e)(1) ("Only one award of punitive damages may be recovered in a court of this state from a defendant for any act or omission if the cause of action arises from product liability, regardless of the number of causes of action which may arise from such act or omission.").

and never once has the U.S. Supreme Court indicated that, where such limitations apply, a judge or jury has *carte blanche* to issue any amount of punitive damages, so long as the statutory limitation is not exceeded. To the contrary, the U.S. Supreme Court has stood by the ratio guidance discussed above, including its statement that "[i]f, for example, the plaintiff has received a substantial compensatory damages award, then a lesser ratio as low as 1:1 may reach the outer limits of the due process guarantee," which is particularly relevant here given the substantial award of wrongful death damages that the district court awarded. *See Williams*, 947 F.3d at 754-55.

*    *    *

Excluding the wrongful-death damages and the damages apportioned to Mazda, the ratio here is an eye-popping 100:1, which far exceeds the constitutional limits. If the wrongful-death damages were counted as "compensatory," the ratio would be 7.4:1,[21] and if the damages apportioned to Mazda also were included, the ratio would be approximately 3.7:1.[22] Even if the single-award limitation under Georgia

---

[21] $100,000,000.00 : $13,509,671.70.

[22] $100,000,000.00 : $27,019,343.40.

31

law might support a slightly higher ratio in some product liability cases, Autoliv Japan submits that these lower ratios still would offend due process in this case. After all, the U.S. Supreme Court has said that a 4:1 ratio "might be close to the line of constitutional impropriety,"[23] *State Farm*, 538 U.S. at 425; *see also BMW*, 517 U.S. at 581; *Williams*, 947 F.3d at 755 (characterizing 4:1 ratio as "default" for "uppermost range" of punitive damages awards), and when compensatory damages are as substantial as $13.5 million (or $27 million)—and especially when those "compensatory" damages include wrongful-death damages that are punitive in nature—even a 4:1 ratio may be constitutionally impermissible. *See State Farm*, 538 U.S. at 425 ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.").[24] Accordingly, given the limited degree of reprehensibility,

---

[23] While this guidance from the Supreme Court in *State Farm* may be dicta, as Ms. Andrews argues (Appellee Br. at 57), this Court has "consistently recognized that dicta from the Supreme Court is not something to be lightly cast aside . . . but rather is of considerable persuasive value." *See F.E.B. Corp v. United States*, 818 F.3d 681, 689-90 n.10 (11th Cir. 2016) (cleaned up). Indeed, "there is dicta . . . and then there is Supreme Court dicta." *Id.* (cleaned up).

[24] The Supreme Court characterized the $1 million compensatory damages award in *State Farm* as "substantial." *See* 538 U.S. at 426; *see*

even a 4:1 ratio predicated on $13.5 million or $27 million in compensatory damages is unconstitutional.[25]

### 3.    *Other Civil Penalties Authorized by Law*

For the final constitutional guidepost, neither Ms. Andrews nor the State disputes that the civil penalty authorized under 49 U.S.C. § 30165 (a) for certain violations of the federal Motor Vehicle Safety Act or federal motor vehicle safety standards promulgated by the Secretary of Transportation is the closest comparable civil penalty for the conduct at issue here. (*See* Appellant Br. at 55.) Nor do they dispute that that "maximum penalty under this subsection for a related series of violations" was capped at the relevant time at $15 million, which is less

---

*also Lompe*, 818 F.3d at 1069 ("[I]n cases decided since *State Farm,* compensatory damages have often been considered 'substantial' when they are over $1,000,000.").

[25] *Cf. Boerner*, 394 F.3d at 603 (holding, in a wrongful death case alleging defective design of cigarettes in which the jury awarded $4 million in compensatory damages, that 1:1 ratio of punitive damages to compensatory damages was constitutionally appropriate, notwithstanding evidence of a high degree of reprehensibility, including tobacco manufacturer's efforts to mislead consumers about health risks associated with smoking); *Clark*, 436 F.3d at 607 (holding, in wrongful death case alleging defective design of pickup truck, and in which jury awarded only $236,000 in compensatory damages, that 2:1 ratio of punitive to compensatory damages marked limit of constitutional permissibility).

than one-sixth of the amount of punitive damages awarded here. (*Id.* at 55-56.) Accordingly, this constitutional guidepost, like the others discussed above, indicates that the $100 million award of punitive damages against Autoliv Japan was unconstitutionally excessive in violation of due process.

## C. In awarding punitive damages, the district court improperly relied on the financial circumstances of Autoliv Japan's parent corporation.

The award of punitive damages against Autoliv Japan also must be set aside because the district court improperly relied on the financial circumstances of Autoliv, Inc., Autoliv Japan's parent company, when it imposed punitive damages. Ms. Andrews argues that the district court's reliance on Autoliv, Inc.'s financial circumstances was not erroneous because the district court simply used those circumstances as evidence of Autoliv Japan's own financial circumstances, which the district court would have been permitted to do. (Appellee Br. at 64.) And she asserts that "[j]udges are presumed to make only appropriate use of properly admitted evidence." (*Id.*) But here, the district court's own judgment shows that it did not merely rely on Autoliv, Inc's financial circumstances as evidence of Autoliv Japan's own financial circumstances. Instead, the

district court relied on Autoliv, Inc.'s financial circumstances as a *substitute* for Autoliv Japan's own financial circumstances.

Indeed, the district court held that it "need not distinguish between Autoliv entities." (Doc. 534 at 93.) And to support its decision to treat the financial circumstances of Autoliv Japan and its parent as one and the same, the district court said that "Autoliv has ignored formal divisions among corporate Autoliv entities when it comes to the seatbelt at issue," that Autoliv Japan is not "autonomous from its parent and sibling companies," and that Autoliv, Inc. and its subsidiaries "operated as a single enterprise for purposes of designing, manufacturing, and selling the seatbelt at issue." (*Id.* at 92-94.) These findings are not consistent with Ms. Andrews' suggestion that the district court simply used Autoliv, Inc.'s financial condition as some evidence of Autoliv Japan's financial condition; rather, they are consistent with the district court disregarding the corporate form and treating Autoliv Japan as if it were Autoliv, Inc. But the district court was not authorized to disregard the corporate form because Ms. Andrews did not show that Autoliv Japan (or its parent) had abused the corporate form, as explained in Autoliv Japan's principal brief. (Appellant Br. at 57-59.) *See United States v. Fid. Cap. Corp.*, 920

F.2d 827, 837 (11th Cir. 1991) (interpreting Georgia law and stating that "courts must exercise great caution, and must not disregard the corporate entity without a showing that the corporate form has been abused") (cleaned up).  The district court erred when it disregarded the corporate form and awarded $100 million in punitive damages against Autoliv Japan based on the financial circumstances of its parent company, Autoliv, Inc.

**D.    The district court did not err in reducing the judgment based on apportionment of fault to Mazda.**

In her cross-appeal, Ms. Andrews claims that the district court erred when it reduced the damages awarded against Autoliv Japan based on an apportionment of fault to Mazda under former O.C.G.A. § 51-12-33(b).[26]  More specifically, Ms. Andrews argues that the statute does not apply in this case—because Autoliv Japan was the only defendant remaining in the case by the time of trial—and for this proposition, she

---

[26] Georgia's apportionment statute was amended after the trial of this case. However, that amendment only applied to "cases filed after the effective date of the Act," which was May 13, 2022, and thus does not apply here. (*See* Doc. 586 at 7 n.3 (citing GA LEGIS 876 (2022), 2022 Georgia Laws Act 876 (H.B. 961)).)

relies on *Georgia CVS Pharmacy, LLC v. Carmichael*, 362 Ga. App. 59, 865 S.E.2d 559 (2021). (Appellee Br. at 66-67.) Ms. Andrews is right that the Georgia Court of Appeals held in *Carmichael* that former O.C.G.A. § 51-12-33(b) does not permit apportionment when there is only a sole defendant at the time of trial, even if there were multiple defendants when the case was commenced. *See* 362 Ga. App. at 72, 865 S.E.2d at 570-71. Ms. Andrews, however, raised this objection to apportionment too late—after trial and even after the district court returned its verdict— and in any event, there are persuasive reasons to conclude that the Georgia Supreme Court would not adhere to *Carmichael.* The district court rejected Ms. Andrews' belated objection to apportionment, and this Court should reject it too.

1.    ***The district court correctly held that Ms. Andrews forfeited her objection to an apportionment of fault to Mazda.***

Apportionment of fault pursuant to former O.C.G.A. § 51-12-33 has long been a part of this case. Autoliv Japan first identified apportionment of fault as a relevant defense in its answer to Ms. Andrews' complaint, stating that its liability, if any, for damages "must be apportioned in accordance with the provisions of applicable law, including O.C.G.A. § 51-

12-33." (Doc. 7 at 29; *see also* Doc. 30 at 29 (Autoliv Japan's answer to Ms. Andrews' amended complaint); Doc. 99 at 29 (Autoliv Japan's answer to Ms. Andrews' second amended complaint).) Then, after this Court reversed the district court's summary judgment ruling and Autoliv Japan returned to the district court as the only remaining defendant, the issue of apportionment became increasingly relevant. For example, as the parties disputed the specifics of the post-appeal scheduling order, Autoliv Japan cited former O.C.G.A. § 51-12-33 and explained that

> [I]n accordance with Georgia law, the names Micah Andrews, Mazda, and Bosch will also appear on the verdict form, and the jury will also determine whether—and to what extent— each of them were responsible for the injuries at issue. *See* O.C.G.A. § 51-12-33.

(Doc. 320 at 6.) In fact, on February 1, 2019—still more than two years before trial—Ms. Andrews stated that it was "unsurprising" that apportionment of fault was Autoliv Japan's "entire defense." (Doc. 350 at 11 (cleaned up).)

Before trial, Ms. Andrews did suggest that apportionment of fault was unavailable in this case. (*See* Doc. 350 at 11 n.15; *see also* Doc. 485-15 at 2-3.) But she did so only in passing and solely on the basis that apportionment of fault was unavailable in strict liability cases like this

one.[27] (*Id.*)  In fact, by the time the pretrial order was submitted, Autoliv Japan's portions of the order indicated that it was "clear" that the fact finder in this case would "decide whether to apportion fault for Mr. Andrews' injuries to Micah Andrews, Mazda, and Bosch" pursuant to former O.C.G.A. § 51-12-33.  (Docs. 485-2 at 3, 485-15 at 2.) And Ms. Andrews' portion of the pretrial order acknowledged that "[w]hether Autoliv has proved that a rational basis exists to try to 'apportion' fault to any person other than Autoliv" was a "legal issue[] to be tried." (Doc. 485 at 9.)

Then, at trial, the district court admitted evidence relevant to the fault of Mr. Andrews, Mazda, and Bosch (*see, e.g.*, Doc. 617-2 (Def. Trial Ex. 14), Doc. 617-7 (Def. Trial Ex. 100), Doc. 617-8 (Def. Trial Ex. 101)), and the parties argued about whether the facts supported apportionment of fault to Mr. Andrews, Mazda, and Bosch.  (*See, e.g.*, Doc. 553 at 6-7, 19, 31, 50-51, 62, 70, 88-89.)

Ms. Andrews did not raise any objection to apportionment at trial, nor did she—at any time—object to apportionment on the ground that

---

[27] The Georgia Supreme Court subsequently held that apportionment of fault is available in strict product liability cases. *See Johns v. Suzuki Motor of Am., Inc.*, 310 Ga. 159, 170, 850 S.E.2d 59, 67 (2020).

Autoliv Japan was the only remaining defendant until her post-trial motion to amend the judgment. (Doc. 536.) That was too late.

Ms. Andrews maintains that she could not reasonably have made this objection before or at the trial because, she explains, the Georgia Court of Appeals issued its decision in *Carmichael* on November 1, 2021, nineteen days after the conclusion of trial. But to the extent that *Carmichael* reflects a correct understanding of Georgia law—it does not, as we discuss below—Ms. Andrews indisputably had grounds for making her objection well before trial. Indeed, *Carmichael* did not even purport to break new ground in its interpretation of former O.C.G.A. § 51-12-33(b). To the contrary, that interpretation followed directly from the Court of Appeals' earlier decision in *Schriever v. Maddox,* 259 Ga. App. 558, 578 S.E.2d 210 (2003), which interpreted an earlier version of the same statute and is the *only* authority cited in *Carmichael* for its interpretation of former O.C.G.A. § 51-12-33(b). *See Carmichael,* 362 Ga. App. at 72, 865 S.E.2d at 570-71 (citing and quoting from *Schriever*).

For that reason, if Ms. Andrews has a meritorious objection to apportionment under *Carmichael,* she had a basis for making precisely the same objection—years before trial—under *Schriever.* As the district

40

court explained in concluding that Ms. Andrews forfeited this objection, "[T]he apportionment principle that [Ms. Andrews] seeks to rely upon dat[es] back to 2003." (Doc. 586 at 7.) "[B]y not adding [her objection to apportionment] to the Pretrial Order and bringing the issue to the Court's attention prior to the entry of Judgment," the district court concluded, Ms. Andrews forfeited the objection. (*Id.* at 7-8.) The district court's rejection of the objection on this ground is consistent with settled law. *See, e.g.*, *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint . . . .") (cleaned up); *Morro v. City of Birmingham*, 117 F.3d 508, 516 n.3 (11th Cir. 1997) ("Counsel may waive the right to have an issue decided by failing to identify the issue to the court at the pretrial conference, regardless of whether the issue is a legal or factual one."); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1152 (11th Cir. 2011) ("We find strong support for our conclusion in a Federal Circuit case that holds 'that when there is a relevant change in the law before entry of final judgment, a party generally must notify the district court . . . .'"). *See also Caban-Wheeler v. Elsea*, 71 F.3d 837, 842 (11th Cir. 1996)

("[B]ecause the [defense of judicial immunity] was not raised during trial or at any time before, the issue was waived."); *Brookhaven Landscape & Grading Co. v. J.F. Barton Contracting Co.*, 676 F.2d 516, 523 (11th Cir. 1982) ("Failure by defendants to object [to introduction of exhibit] on the ground of prejudice or to request a limiting instruction to the jury constitutes a waiver of objection on that ground.").  Indeed, this Court "ha[s] not hesitated to back up district courts when they put steel behind the terms of pretrial orders and hold parties to them." *Morro*, 117 F.3d at 515 & 516 n.3 (affirming waiver ruling where the district court and opposing party were "blindsided with the issue at the end of the case," saying "[t]hat sort of ambush is precisely what the pretrial conference and order are designed to avoid").

### 2. The district court also correctly found persuasive evidence that the Georgia Supreme Court would not adhere to Carmichael's interpretation of former O.C.G.A. § 51-12-33(b).

Under the *Erie* doctrine, the district court was required to construe and apply former O.C.G.A. § 51-12-33(b) as it believed the Georgia Supreme Court would. *See Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church,* 420 F.3d 1317, 1326 n.5 (11th Cir. 2005). As this Court has explained:

42

> Where the highest court—in this case, the [Georgia] Supreme Court—has spoken on the topic, we follow its rule. Where that court has not spoken, however, we must predict how the highest court would decide this case. Decisions of intermediate appellate courts—here, the [Georgia Court of Appeals]—provide data for this prediction. As a general matter, we must follow the decisions of these intermediate courts. But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise.

*Molinos Valle del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011) (citations omitted). *See also Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009). As the district court correctly concluded, there are good reasons to conclude that the Georgia Supreme Court would reject *Carmichael* to the extent it holds that former O.C.G.A. § 51-12-33(b) does not apply to a lawsuit originally brought against multiple defendants, but in which only one defendant remains by the time of trial. (Doc. 586 at 9-10.)

> a.   *The Georgia Supreme Court may soon resolve this question about the meaning of former O.C.G.A. § 51-12-33(b).*

Before this case is decided, we may know definitively whether the Georgia Supreme Court would adhere to *Carmichael.* The Supreme Court last year granted a petition for writ of certiorari in *Carmichael,* Case No. S22C0527, and the case was argued in the Supreme Court on February

43

8, 2023. In the light of the state constitutional requirement that the Supreme Court render a decision within two of its terms of court, *see* Ga. Const., art. VI, § IX, ¶ II, the Supreme Court likely will announce its decision in the *Carmichael* case no later than June 30, 2023. And that forthcoming decision may well address the issue presented here directly.[28]

---

[28] When the Supreme Court granted the petition for a writ of certiorari, it directed the parties to submit briefs on particular questions. The Court did not specifically direct the parties to brief whether former O.C.G.A. § 51-12-33(b) applies when only one defendant remains in the case at the time of trial. But it *did* direct the parties to submit briefs on a question inextricably intertwined with the applicability of the apportionment statute. *See* Order Granting Petition for Certiorari, Case No. S22C0527 (Ga. Oct. 4, 2022) ("When apportioning fault, can a rational fact finder determine that a [non-party] intentional tortfeasor whose actions directly caused the plaintiff's injuries bears no fault for those injuries?"). Consequently, the issue presented here—whether former O.C.G.A. § 51-12-33(b) applies, for purposes of reducing a defendant's liability based on the percentage of fault of a non-party, when only one defendant remains in the case at the time of trial—*was* addressed in the plaintiff-appellee's brief, the defendant-appellant's reply brief, no fewer than three amicus briefs, and supplemental briefs filed by both the plaintiff-appellee and the defendant-appellant. *See generally Carmichael,* Case No. S22C0527. The issue was also discussed at oral argument. And although the Supreme Court did not specifically direct the parties to submit briefs on this topic, when it grants certiorari on *any* issue in a case, it has the authority to decide *any and all* issues in the case. *See Cheeley v. Henderson,* 261 Ga. 498, 500, 405 S.E.2d 865, 867 (1991) ("[T]he posing of questions in no way limits the Court in its decision-making authority. We have absolute discretion to address any portion or all of the case before us."). It is hardly fanciful, therefore, to

If it does not, this Court should not construe the decision as an endorsement of the interpretation afforded former O.C.G.A. § 51-12-33(b) by the Court of Appeals. When the Georgia Supreme Court reviews a decision of the Court of Appeals, it may review any issue in the case, but it sometimes limits its review to fewer than all of the issues addressed by the Court of Appeals. When the Supreme Court so limits the scope of its review—and says and decides nothing, expressly or by necessary implication, about an issue that the Court of Appeals had addressed—its decision is *not* an expression of any opinion about the other issue, much less an endorsement of the Court of Appeals' analysis of the other issue. *See, e.g., Gatto v. City of Statesboro,* 312 Ga. 164, 165, 860 S.E.2d 713, 716 n.2 (2021); *Collins v. Athens Orthopedic Clinic,* 307 Ga. 555, 564, 837 S.E.2d 310, 316 n.8 (2019); *Turner v. Ga. River Network,* 297 Ga. 306, 309, 773 S.E.2d 706, 709 n.6 (2015).

---

think that the Supreme Court may well address this issue in its forthcoming decision.

> b.    *The plain language of former O.C.G.A. § 51-12-33(b)—and settled principles of statutory interpretation in Georgia—indicate that the Georgia Supreme Court would not follow the Court of Appeals' interpretation of that provision.*

In the event that the Georgia Supreme Court in its forthcoming decision does not address whether former O.C.G.A. § 51-12-33(b) applies when only one of several defendants remains by the time of trial, there are good reasons to conclude that it would not ultimately resolve the question as the Court of Appeals did in *Carmichael*. The Georgia Supreme Court has held that a statute draws its meaning from its text. *Zaldivar v. Prickett*, 297 Ga. 589, 591, 774 S.E.2d 688, 691 (2015). For that reason, when the Supreme Court interprets a statute, it "presume[s] that the General Assembly meant what it said and said what it meant," *Deal v. Coleman*, 294 Ga. 170, 173, 751 S.E.2d 337, 341 (2013) (cleaned up), and it reads the text "in its most natural and reasonable way, as an ordinary speaker of the English language would." *Zaldivar*, 297 Ga. at 591, 774 S.E.2d at 691 (cleaned up). And in this case, the statutory text at issue has a plain meaning inconsistent with the decision of the Court of Appeals in *Carmichael*.

Former O.C.G.A. § 51-12-33 has three provisions that govern the reduction of damages based on one's percentage of fault. *See Alston & Bird, LLP v. Hatcher Mgmt. Holdings, LLC*, 312 Ga. 350, 354, 862 S.E.2d 295, 299 (2021). Subsection (a) describes what should be done when the plaintiff shares responsibility for the injury or damages:

> Where an action is brought against one or more persons for injury to person or property and the plaintiff is to some degree responsible for the injury or damages claimed, the trier of fact, in its determination of the total amount of damages to be awarded, if any, shall determine the percentage of fault of the plaintiff and the judge shall reduce the amount of damages otherwise awarded to the plaintiff in proportion to his or her percentage of fault.

*Id.* (quoting former O.C.G.A. § 51-12-33(a)). Subsection (g) provides that "the plaintiff shall not be entitled to receive any damages if the plaintiff is 50 percent or more responsible for the injury or damages claimed." *Id.* (quoting former O.C.G.A. § 51-12-33(g)) (internal quotation marks omitted). And subsection (b) provides for instances in which someone other than the plaintiff shares responsibility with a named defendant for the injury or damages:

> <u>Where an action is brought against more than one person</u> for injury to person or property, <u>the trier of fact</u>, in its determination of the total amount of damages to be awarded, if any, <u>shall</u> after a reduction of damages pursuant to

subsection (a) of this Code section, if any, <u>apportion its award</u> <u>of damages among the persons who are liable according to the</u> <u>percentage of fault of each person</u>. Damages apportioned by the trier of fact as provided in this Code section shall be the liability of each person against whom they are awarded, shall not be a joint liability among the persons liable, and shall not be subject to any right of contribution.

*Id.* (quoting former O.C.G.A. § 51-12-33(b)) (emphasis added).

In *Hatcher*, the Georgia Supreme Court held that, under former O.C.G.A. § 51-12-33(b), there is no right to an apportionment of damages unless an action "is brought" against more than one defendant. 312 Ga. at 356, 862 S.E.2d at 300.    Three months later, in *Carmichael*, the Georgia Court of Appeals cited *Schriever* and held that the determination of whether "an action is brought against more than one person" should be made at the time of trial, not when the action is actually "brought." 362 Ga. App. at 72, 865 S.E.2d at 570-71.

In doing so, the *Carmichael* Court concluded that, even if a case were filed against multiple defendants, the case is only "an action . . . brought against more than one person" for purposes of apportionment if there are multiple defendants remaining at the time of trial.  *See* 362 Ga. App. at 72, 865 S.E.2d at 570-71 (concluding that since "CVS was the only named defendant in the case by the time the case proceeded to trial[,]"

then "the case was no longer 'an action [] brought against more than one person' for apportionment purposes" (quoting *Schriever*, 259 Ga. App. at 561, 578 S.E.2d at 213-14)).

In ascertaining the plain meaning of a statutory term (here, "an action is brought against more than one person"), the Georgia Supreme Court often refers to dictionaries in common usage, as well as legal dictionaries and explanations of the same term in the decisional law. *See, e.g.*, *Lathrop v. Deal*, 301 Ga. 408, 442, 801 S.E.2d 867, 890 (2017); *State v. Randle*, 298 Ga. 375, 378, 781 S.E.2d 781, 784 (2016). Dictionaries recognize that to "bring an action" means "to sue; institute an action." Black's Law Dictionary (11th ed. 2019) ("bring an action"); *see also* Black's Law Dictionary 174 (5th ed. 1979) ("To 'bring' an action or suit has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit. . . . A suit is 'brought' at the time it is commenced. . . ."); Random House Unabridged Dictionary, *www.dictionary.com* ("to bring") ("Law. to commence: to bring an action for damages."). The Georgia Court of Appeals has recognized that the word "brought" refers to the commencement of a legal proceeding:

> To "bring" an action "has a settled customary meaning at law, and refers to the initiation of legal proceedings in a suit."

> Black's Law Dictionary (6th ed. 1990); *see also* Merriam-Webster Online Dictionary (2020) ("bring" defined as "to cause to exist or occur," such as to institute or to bring a legal action).

*CL SNF, LLC v. Fountain*, 355 Ga. App. 176, 182-83, 843 S.E.2d 605, 612 (2020), *rev'd on other grounds*, 312 Ga. 416, 863 S.E.2d 116 (2021). The Georgia Supreme Court itself said long ago in *Jordan v. Bosworth*, 123 Ga. 879, 880, 51 S.E. 755, 756 (1905) that "[t]here is no substantial difference between *bringing* a suit, and *commencing* a suit." And other courts have similarly explained "brought." *See Carter v. Allen*, 940 F.3d 1233, 1239 (11th Cir. 2019) ("[T]his Court has held that 'brought' refers to 'the initiation of legal proceedings in a suit.'"); *Goldenberg v. Murphy*, 108 U.S. 162, 163-64 (1883) ("We see no significance in the fact that in the legislation . . . the word 'commenced' is sometimes used, and at other times the word 'brought.' In this connection the two words evidently mean the same thing, and are used interchangeably."); *Soileau v. Smith True Value and Rental*, 2012-1711, p. 9 (La. 6/28/13), 144 So. 3d 771, 778 ("[T]he legislature used the word 'brought' as in 'initially filed' or 'commenced.'").

Thus, when reading the text of Georgia's apportionment statute in light of the common and customary usage of "brought," as used in a legal

context to refer to a lawsuit—which is the analysis required by *Hatcher* and a long line of Georgia Supreme Court opinions about how statutes are to be construed—it is clear that former O.C.G.A. § 51-12-33(b) applies to actions, like this one, that are filed against multiple defendants.[29] *See Hatcher*, 312 Ga. at 354, 862 S.E.2d at 299. For its part, however, the Georgia Court of Appeals in *Carmichael* did not engage in this or any other meaningful analysis of the statutory text. *See* 362 Ga. App. at 70, 865 S.E.2d at 570. To the contrary, the Court of Appeals simply pointed to, and relied exclusively upon, *Schriever*, another decision in which the Court of Appeals did not engage in any meaningful analysis of the statutory text. *See id.; Schriever*, 259 Ga. App. at 561, 578 S.E.2d at 213-14. And more importantly, *Schriever* concerned a *different* version of the statute that *only* permitted apportionment among named defendants[30] (and did not contemplate apportionment to nonparties), such that the absence at trial of any additional named defendant to whom fault could be apportioned would be dispositive of whether the apportionment-

---

[29] In her Complaint, Ms. Andrews named more than 13 different Defendants. (*See* Doc. 1-2 at 13.)

[30] The statute was amended to authorize nonparty apportionment by Ga. L. 2005, p. 1, § 12, two years after *Schriever*.

among-named-defendants statute could apply (irrespective of the meaning of "brought against more than one person"). *See Schriever,* 259 Ga. App. at 561, 578 S.E.2d at 213-14; *cf. Dep't of Transp. v. Blair*, 220 Ga. App. 342, 345, 469 S.E.2d 446, 450 (1996) (interpreting the prior version of the statute); *see also Dekalb Cnty. Bd. of Tax Assessors v. Barrett*, 361 Ga. App. 598, 604, 865 S.E.2d 192, 196 (2021) (indicating that a case construing a statute is not precedent for the construction of a different statute, even when the different statute uses some of the same language).

In an effort to provide an ostensibly textual analysis missing in *Carmichael* (and *Schriever*) but still reach the same result, Ms. Andrews hangs almost everything on the word "is," asserting that "is brought" must be understood in former O.C.G.A. § 55-12-33(b) to refer in the present tense to the time of trial, such that a case "is brought against more than one person" only if there is more than one defendant at the time of trial. But the word cannot bear the weight that Ms. Andrews tries to hang on it. In the first place, accepting the premise of Ms. Andrews' tense-based grammatical argument, former O.C.G.A. § 55-12-33(b) uses *two* tenses to refer to *two* points in time: the present-tense "is brought

against more than one person" to establish the predicate for apportionment, followed by the future-tense "the trier of fact . . . shall . . . apportion its award" to describe the statutory directive to apportion. When one event occurs at one point in time—when an action is brought against more than one person—then a right arises to insist in the future that the trier of fact *shall* apportion its award based on percentages of fault. Nothing about the present-tense "is" tells us the point in time—at the commencement of the lawsuit or at the start of the trial—at *which* the right to insist upon apportionment arises. But "brought"—which refers most commonly in a legal context to the *initiation* of a lawsuit (see authorities cited above)—does answer that question.

Moreover, Ms. Andrews cites *In re P.D.W.,* 296 Ga. App. 189, 674 S.E.2d 338 (2009), as support for her tense-based argument, but that case is distinguishable. In *P.D.W.,* the Court of Appeals held that a child "is a deprived child" if the child *currently* is deprived. 296 Ga. App. at 191, 674 S.E.2d at 342. But "deprived"—used here as an adjective, not as a part of a compound verb (as in "is brought")—refers to a status that may change over time. A child once deprived may not always be deprived. But "brought"—when used with reference to the

53

commencement of a lawsuit—is a characteristic that is fixed as of one point in time. When a lawsuit is commenced against more than one person, the lawsuit—by definition, then and always—"is brought against more than one person." Nothing in *P.D.W.* compels *Carmichael's* interpretation of former O.C.G.A. § 51-12-33(b).

For these reasons, the district court correctly found persuasive evidence that the Georgia Supreme Court would not adhere to *Carmichael* with respect to its interpretation of former O.C.G.A. § 51-12-33(b). Properly understood, the statute permitted apportionment in this case—a lawsuit that is brought against more than one defendant, notwithstanding that only one defendant remained in the case by the time of trial—and the district court properly apportioned fault to Mazda and reduced the damages awarded against Autoliv Japan consistent with the apportionment of fault.

## E.    Conclusion

For the foregoing reasons, the amended judgment issued by the district court should be reversed in part, and the award of punitive damages should be set aside altogether or reduced. The district court's

decision to reduce the judgment based on apportionment of fault to Mazda should be affirmed.

Respectfully submitted, this 20th day of June, 2023.

|  | /s/ William J. Repko III |
|---|---|
| ALSTON & BIRD LLP | Doug Scribner |
| 1201 West Peachtree Street | Georgia Bar No. 632755 |
| Atlanta, GA 30309-3424 | Keith R. Blackwell |
| (404) 881-7000 (telephone) | Georgia Bar No. 024493 |
| (404) 881-7777 (facsimile) | Jenny A. Hergenrother |
|  | Georgia Bar No. 447183 |
|  | William J. Repko III |
|  | Georgia Bar No. 301797 |
|  | *Attorneys for Appellant* |

55

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Fed. R. App. P. 28.1(e)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,163 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Century Schoolbook 14-point font.

This 20th day of June, 2023.

| | |
|---|---|
| | /s/ William J. Repko III |
| ALSTON & BIRD LLP | Doug Scribner |
| 1201 West Peachtree Street | Georgia Bar No. 632755 |
| Atlanta, GA 30309-3424 | Keith R. Blackwell |
| (404) 881-7000 (telephone) | Georgia Bar No. 024493 |
| (404) 881-7777 (facsimile) | Jenny A. Hergenrother |
| | Georgia Bar No. 447183 |
| | William J. Repko III |
| | Georgia Bar No. 301797 |
| | |
| | *Attorneys for Appellant* |

1

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2023, I filed an electronic copy of the foregoing brief with the United States Court of Appeals for the Eleventh Circuit via CM/ECF, which will automatically send notification of such filing to all attorneys of record.

/s/ William J. Repko III
William J. Repko III
Georgia Bar No. 301797